## SETH P. JONES AND ANOTHER *vs.* THE QUINNIPIACK BANK AND OTHERS.

Where a mortgage is given *to secure a debt,* whether the debt be in a negotiable form or not, a transfer of the debt transfers in equity the security, if the security has not previously been surrendered by the creditor.

But where a mortgage is given, not to secure a debt, but *to indemnify a surety,* there the security does not in the first instance attach to the debt, as an incident to it, but whatever equity may arise in favor of the creditor with regard to the security, arises afterwards, and comes into existence only upon the insolvency of the parties holden for the debt.

Until this equity arises, the surety has a right, in equity as well as law, to release the security.

And the equity of the creditor in such a case not being an inherent one, growing out of the contract, but resulting merely from a state of facts which entitles him to equitable relief, and becoming fixed only by the interposition of a court of equity, it seems that the relief can not be furnished, even though insolvency has intervened, unless the security is still retained by the surety at the time of the application of the creditor for relief.

*J* mortgaged certain real estate to *B,* to secure him for accepting his drafts to the amount of $50,000. Most of the drafts were at once drawn and accepted. The condition of the mortgage was that *J* should *pay at maturity all such acceptances and save B harmless therefrom.* A few days after, *J* desiring to procure a loan from *Q,* an arrangement was made under which *B* mortgaged to *Q* all his interest in the mortgaged premises for the security of the loan, and *Q* upon the security advanced $30,000 to *J.* Both *J* and *B* intended to give to *Q,* and *Q* supposed that he was acquiring, an interest that was equivalent to a first mortgage of the premises. *J* and *B* were both at this time solvent and in good credit, but afterwards failed. At the time of their failure the loan to *Q* was unpaid, as were also the acceptances of *B* under the original mortgage; which latter were then held by parties to whom they had been negotiated. Upon a bill in equity brought by certain holders of these acceptances, against *Q,* for the application of the mortgaged premises to the payment of the acceptances, it was held, 1. That the mortgage was to be regarded as a personal security to *B* for his acceptances for *J,* and not as a security for the bills so accepted. 2. That while *J* and *B* were solvent, no equity arose with regard to the security in favor of the holders of the bills. 3. That while no such equities existed *B* had a perfect right to surrender the security to *J,* or with his concurrence to make a transfer of it to *Q,* as security for the loan made by the latter to *J.* 4. That the right thus acquired by *Q* was not affected by the equity in favor of the holders of the bills which arose afterwards upon the failure of *J* and *B.*

*C,* one of the petitioners, had received certain of the bills from *J,* as collateral security for a temporary loan, with an agreement that after the loan was paid *C* might at his option return the bills, or retain them in the place of certain other paper of *J* held by *C.* *C* knew, at the time, of the mortgage to *B,* but had no knowledge of the transaction with *Q.* The temporary loan was soon after paid,

but *C* did not exercise his right of option until some weeks after, when he had heard of the conveyance of the security to *Q* and of the loan of *Q* upon it, and he then elected to retain the bills and give up the other paper, and in doing so had it in view to secure the benefit of the mortgage. Held, that he must be regarded as having taken the bills at the time when he elected to retain them, and not at the time when they were delivered to him, and to have taken them therefore with notice of the rights of *Q*.

A covenant not to sue, is in equity a release.

Where two persons unite as petitioners in a bill in equity, if either is not entitled to relief, the bill must be dismissed as to both.

BILL IN EQUITY to compel a conveyance of certain real estate, and for a foreclosure. The petitioners were Seth B. Jones and the New Haven County Bank. The facts, as found by a committee, were substantially as follows :—

The Jerome Manufacturing Company, a joint stock corporation, on and previous to the 7th day of November, 1855, owned the premises in question, subject to a mortgage to one Dorsett, dated July 30th, 1853. On the 7th of November, 1855, the company conveyed the premises, by a mortgage deed, to Phineas T. Barnum ; the condition of the mortgage being as follows :—" The condition of this deed is such, that whereas the said Barnum has this day become the indorser and acceptor on the bills and notes of the said grantor, or upon bills and notes for the benefit of said grantor, to the amount of fifty thousand dollars, and may also continue to be acceptor or indorser upon like bills or notes to that amount, either in renewal thereof or anew ; now, therefore, if the said grantor shall pay at maturity all such acceptances, or notes and bills, and save harmless the said Barnum by reason of his said indorsements or acceptances, at any time outstanding to that amount, then this deed shall be null and void, but otherwise of full force and effect in the law." On the same day, and on the 9th of November, Barnum, upon the security of the mortgage, accepted bills drawn on him by the company, to the amount of over $50,000; of which bills three, for $2,000, $1,500 and $1,000 respectively, dated October 17th, 20th and 26th, 1855, and payable at six months, were held, at the time the suit was brought, by the New Haven County Bank, and

most of the others, under circumstances which will be stated hereafter, by the other petitioner, Jones.

On the 15th of November, 1855, the Jerome Company and Barnum proposed to the Quinnipiack Bank, (the principal respondent,) to make a loan of $30,000 to the company, by discounting the drafts of the company, accepted by Barnum, to that amount; and it was finally agreed that the bank should advance Virginia bonds to that amount, that twelve drafts of the Jerome Company on Barnum for $2,500 each should be accepted by him and delivered to the bank, and that Barnum should assign to the bank the mortgage of the Jerome Company above described. The bills were at once drawn and accepted by Barnum and delivered to the bank, and an assignment of the mortgage was executed by Barnum and delivered with the mortgage to the bank, and on the same day left at the office of the town clerk for record. After the assignment was left for record, however, the counsel of the bank, upon examining it, was dissatisfied with it, and notice was at once sent to the Jerome Company to that effect; and on the 21st of November an arrangement was made between the bank on the one part and the Jerome Company and Barnum on the other, under which Barnum executed a quitclaim mortgage-deed of the premises to the bank, the condition of the deed being as follows:—" The condition of the above deed is such, that whereas I am holden to said Quinnipiack Bank in the sum of thirty thousand dollars, as the acceptor of twelve certain drafts, drawn on me by said Jerome Manufacturing Company, payable to the order of Chauncey Jerome, and by him indorsed to said bank, each for the sum of twenty-five hundred dollars, six bearing date the 1st day of November, 1855, and payable in six, seven, eight, nine, ten, and eleven months from their date, and six bearing date the 15th day of November, 1855, and payable in six, seven, eight, nine, ten, and eleven months from their date ; now, if I shall well and truly pay or cause to be paid each and every of said drafts, according to their tenor and effect, then this deed shall be void, but otherwise of full force." The mortgage was at once put upon record. Immediately on receiving it the Quinnipiack Bank

delivered the $30,000 of Virginia bonds to the Jerome Company.

The Jerome Company and Barnum were solvent and in good credit at the time, and the mortgage was taken by the bank in good faith, in the belief that Barnum had the right to mortgage the premises as exclusive security for the twelve acceptances mentioned, and without any knowledge of the existence of the other acceptances, except so far as the condition of the original mortgage would be regarded in law as notice to them; and the bank had no knowledge that any other parties had acquired any interest or claimed to have any equity in the mortgage. It was well understood by Barnum and the Jerome Company that the bank took the mortgage in the belief that it operated as exclusive security for the acceptances discounted by the bank, and it was their intention by the arrangement to pledge the mortgage for the exclusive security of these acceptances.

There was no evidence before the committee to show at what date any of the first acceptances were negotiated by the Jerome Company, or whether before or after the discount of the twelve acceptances by the Quinnipiack Bank, except as to the three acceptances held by the New Haven County Bank, and one of the others, which was found to have been negotiated afterwards. As to the three acceptances held by the County Bank, it was found that they were deposited with the bank by the Jerome Company, as collateral security for a temporary loan made by the bank to the company, on an agreement that upon the repayment of the loan the bank should have the option of returning the same, or taking them in place of a like amount of other paper of the Jerome Company held by the bank, on which Barnum's name did not appear, but which was guarantied by him in a separate instrument, and that one object of the bank in making the temporary loan was to secure this option, the bank being then aware of the mortgage to Barnum, and supposing that these acceptances might have been made under the mortgage; that the loan and the pledge of the acceptances were made after the 15th day of November, 1855, when the agreement was made by the Quinnipiack Bank for

the discount of the twelve acceptances, but whether before the 22d of November, 1855, the time when the latter bank actually discounted the acceptances, did not appear, but it was before any actual knowledge on the part of the County Bank of the arrangement with the Quinnipiack Bank; that the temporary loan was repaid within three or four days after it was made, and the County Bank, retaining in their possession the three acceptances, held the matter of their substitution for the other paper in suspense for several weeks, (being in doubt which way the advantage lay, the three acceptances having a much longer time to run than those which they then held, but, on the other hand, being considered by the bank as probably accepted under the mortgage, and as therefore giving the bank a claim upon it,) but finally, being required by the company to decide, determined to make, and on the 28th of December, 1855, did make the substitution, discounting for the company the three acceptances, and giving up the other paper to an equal amount; but that when the determination and substitution were made, the bank had actual knowledge of the mortgage by Barnum to the Quinnipiack Bank.

On the 14th of February, 1856, the Jerome Company, having become insolvent, made an assignment in insolvency to trustees for the benefit of their creditors, the assignment carrying the equity of redemption in the mortgaged premises; and on the 28th of May, 1857, the trustees, after advertising the equity of redemption for sale, sold the same under an order of the court of probate, to the Quinnipiack Bank, for the sum of $180, and conveyed the same to the bank.

On the 30th of January, 1856, Barnum went into insolvency, and on the 23d of October, 1857, with the trustees of his estate—(the latter acting under an order of the court of probate, and upon legal notice)—executed to the Quinnipiack Bank a release of all interest of either Barnum or the trustees in the premises in question. The bank had previously agreed with him, that if he would execute and procure such a release to the bank, they would deliver up the twelve acceptances; and on the delivery of the release they gave up the acceptances. This arrangement was made by the bank in the belief that such

release would make the title of the bank to the premises good, and the acceptances would not have been given up except for such belief, which was well known to Barnum. Nothing had ever been paid on the acceptances.

On the 3d of August, 1857, the Quinnipiack Bank paid the mortgage debt due to Dorsett, (on the mortgage before mentioned as prior to that of the Jerome Company to Barnum,) amounting to $448.26, and received from him a conveyance of the legal title held by him under the mortgage.

On the 19th of May, 1857, the New Haven County Bank made an agreement in writing with one James D. Johnson, who was one of the trustees of the insolvent estate of Barnum, and his agent in the settlement of the claims against him, with regard to his acceptances held by the bank; which, after stating the indebtedness and liabilities of Barnum to the bank, proceeded as follows:

" And whereas the said Johnson is desirous of saving the said Barnum harmless upon his said liabilities, and at the same time that the said bank should be permitted to reserve all its rights against the other parties to said obligations, and the paper now held by it as aforesaid, also its rights against the estate of the Jerome Manufacturing Company, now in process of settlement:—Now therefore, in consideration of the premises, and of the agreements of the said Johnson hereinafter mentioned, the said bank agrees on its part that it will not prosecute or enforce any of the claims aforesaid against the said Barnum or his estate, reserving to itself, however, the right of enforcing and recovering the same against all the other parties thereto, and also reserving all dividends or other rights to which it is or may be entitled from the estate of the Jerome Manufacturing Company. The bank also agrees to assign and convey to the said Johnson any rights which it may have as against the estate of the said Barnum, and permit him to receive any dividends therefrom to which it may be entitled, to his own use. It further agrees that whenever it shall have recovered judgment against the other parties to said paper and obligations, it will cancel the said Barnum's liability thereon, provided

it can safely do so without discharging its said claims against such other parties. And the said Johnson, on his part, agrees that he will pay to the said bank, for the considerations aforesaid on its part to be performed, the sum of $10,000, with interest thereon from April 18th, 1857, whenever and as soon as a dividend shall have been declared and become payable on the estate of the Jerome Manufacturing Company ; and if he is then unable to pay the whole of said sum, he will secure the balance then unpaid by paper satisfactory to said bank."

In making this agreement Johnson was acting in behalf and as the agent of Barnum. The $10,000 was paid, or secured to the satisfaction of the bank. The three bills accepted by Barnum under the mortgage of the Jerome Company of November 7th, 1855, were embraced in the agreement. The bank, however, was not pursuing the present suit for the benefit of Barnum, but for the purpose of obtaining further satisfaction, for its own benefit, from the mortgaged property.

The remaining acceptances (under the mortgage of November 7th, 1855,) held by the petitioner Jones, were bought up by Barnum's agents for his benefit, most of them before and a part after the surrender of the twelve acceptances by the Quinnipiack Bank, and, at the time of their transfer to Jones, were in fact the property of Barnum. On most of them Barnum, through his agent Johnson, received a dividend of ten per cent. from the trustees of the Jerome Company's estate, although they were presented to the commissioners on the estate in the name of various persons. No mention of any security thereon was made to the commissioners or reported by them, and the dividend of ten per cent. was ordered and paid without reference to or deduction for any security. It did not appear that any holder of any of these acceptances had ever taken the same with reference to the mortgage to Barnum, nor had the Quinnipiack Bank ever, until the commencement of the present suit, any knowledge that any acceptances whatever were outstanding in the hands of any person who looked to the mortgaged premises as security therefor. On the 18th day of December, 1857, one Oatman,

who had acted for Barnum as one of his agents in buying up
his acceptances, at the instance of Barnum, but under the
pretense that he was himself the real owner and holder of
said paper, which was then in his possession,—(the falseness
of which pretense Jones did not know, but in the opinion of
the committee had reason to suspect,)—bargained with him
for a transfer to him of the acceptances, and finally trans-
ferred them to him, in consideration of a note which Jones
executed and delivered to Oatman, and which was the only
consideration therefor, which note was of the tenor following:
" For value received, I promise to pay to Joel S. Oatman
twenty-five thousand dollars, with interest at the rate of six
per cent., upon the collection of the within described drafts,
for the collection of which I bind myself to use reasonable
diligence.. Bridgeport, Dec. 18th, 1857.   SETH B. JONES."
A list of the acceptances accompanied the note.   The trans-
fer to Jones was received by him with notice of the mortgage
to Barnum, and of the mortgage from Barnum to the Quin-
nipiack Bank, but with the design of looking to the mortgaged
premises as a security for the acceptances.   It was the expecta-
tion of both Oatman and Barnum that the benefit of the suit,
to the amount of the note given by Jones to Oatman, should
enure to Barnum.

The Quinnipiack Bank laid out, after receiving the deed
from the trustees of the estate of the Jerome Company, dated'
May 1st, 1857, considerable sums of money in taking care of
the premises and in keeping them insured, and also purchased
of the trustees, on the 28th of May, 1857, at the cost of
$2,665.10, machinery and fixtures connected with the premi-
ses, and the whole of the property would not be more than
sufficient to pay the cost of the premises to the bank.   The
bank, since the 28th of May, 1857, has been in the receipt of
an annual rent from the premises of two thousand dollars.

The Quinnipiack Bank, Barnum, and the trustees of the
insolvent estate of Barnum, were made respondents.   The
bill prayed that the respondents be foreclosed of all right to
redeem the premises, unless they paid the amount of the
acceptances held by the petitioners, and embraced in the

mortgage of November 7, 1855; and that upon failure to pay, the Quinnipiack Bank be required to convey the premises to the petitioners, or that the court would decree that the title to the same should become vested in the petitioners.

The superior court accepted the report of the committee, and dismissed the bill; and the petitioners brought the case before this court by motion in error. The errors assigned were, 1st. That the court erred in not granting the prayer of the bill upon the facts found. 2d. In not making a decree in favor of the New Haven County Bank, upon the facts found, even if no decree should be made in favor of the petitioner Jones, as the claim of the former was distinct from that of the latter.

*Dutton* and *Bristol*, with whom was *Hawley*, for the plaintiffs in error.[*]

1. Whenever a mortgage is given to secure the payment of a debt, any party holding the debt has a right to claim that the mortgage shall be appropriated to the payment of the debt which was intended to be secured by it. *Homer* v. *Savings Bank*, 7 Conn., 484. *New London Bank* v. *Lee*, 11 id., 112. *Belcher* v. *Hartford Bank*, 15 id., 383. *Lewis* v. *Deforest*, 20 id., 427. The principle is applicable to two classes of cases; first, where the fund is placed in the hands of a creditor, and the surety seeks to compel the creditor to apply the fund toward the payment of the debt; and, second, where the fund is placed in the hands of the surety, and the creditor seeks to compel the surety to apply the fund to the payment of the debt. This case belongs to the latter class. The general principle, in both cases, is, that the debt is protected by

[*] Before proceeding to the argument, Mr. Dutton moved that as there were two petitioners, whose interests were not identical, and who had different counsel, separate arguments be allowed for each. Mr. Baldwin objected. *Per curiam.* As the petitioners have united they must be taken to have a common interest, and to make but one party. The case is very different from that of several respondents brought in on a bill in equity, for there there may be as many separate and even hostile interests as there are respondents. Here there must be a common interest or the petitioners could not unite. Only the usual number of arguments can be heard.

the mortgage. "No matter," says Church, C. J., in *Belcher* v. *Hartford Bank*, supra, "how the debt may be modified or into whose hands it may come; until it is paid the pledge accompanies it, and remains for its redemption." Here the mortgage was made to secure the payment of the drafts, and not as an indemnity against loss to Barnum personally. The language of the condition is : "Now, therefore, if the grantor shall pay at maturity all such acceptances," &c.; and could only be fulfilled, therefore, by the payment of the acceptances.

2. The mortgage of the mortgage, (by which Barnum mortgaged to the Quinnipiack Bank all the rights which he had acquired by the mortgage from the Jerome Company,) if it had any effect, only passed to the bank the legal title to the property, for the use of those parties who had become, or should afterwards become, the holders of the paper which was intended to be secured by the original mortgage from the Jerome Company. 1st. Barnum himself, at the time he executed that mortgage, had no valuable interest in the paper secured thereby. He had only become an accommodation acceptor or indorser. He was a mere surety to the holders of the paper described in the condition of the mortgage from the Jerome Company, and could confer no greater right upon the Quinnipiack Bank than he himself had. 2d. The paper which was intended to be secured by Barnum's mortgage to the Quinnipiack Bank, was not the same paper which was secured by the mortgage from the Jerome Company to Barnum. It was, therefore, an attempted appropriation of that mortgage to a purpose not intended by the parties at the time when it was made, and inconsistent with the rights of the Jerome Company, and of their creditors. It appears that the acceptances which the Quinnipiack Bank took, were not the paper which was intended to be secured by the original mortgage, because that paper was predicated upon a new transaction, and because it seems to have been the understanding of the parties that the $50,000 contemplated by the original mortgage had become exhausted. These acceptances do not come within the description of paper in the condition of the mortgage from the Jerome Company to Barnum, nor is there

any proof that they were intended to be covered by it. The parties could not have intended to create an open mortgage, which should extend, pro rata, over all the liabilities of every kind which might be assumed by Barnum for the Jerome Company. Further, the legal effect of the first mortgage must have been to cover the acceptances which were first drawn, after that mortgage was executed, to the amount specified in the mortgage. 3d. Whether the County Bank took their acceptances before or after the mortgage by Barnum to the Quinnipiack Bank, does not change the aspect of the case. They took them, as the case finds, before they had any knowledge of the mortgage by Barnum to the Quinnipiack Bank. Barnum had placed the acceptances in the hands of the Jerome Company to be set afloat. The County Bank had taken them, relying upon the security of the mortgage. It would, therefore, be a fraud upon their rights, if Barnum could convey that mortgage for a purpose different from that which was originally intended by the parties. As the paper held by the County Bank comes within the description contained in the condition of the Jerome mortgage, and as the paper of the Quinnipiack Bank does not come within that description, the Quinnipiack Bank must show their prior right under the mortgage, if they have any. 4th. The act of the Quinnipiack Bank in taking such a mortgage, under the circumstances, shows a reckless disregard of the rights of other parties, who might be, or might become, the holders of Barnum's paper, and does not entitle them to the favorable consideration of a court of equity.

3. The agreement between the County Bank and Johnson does not prevent the County Bank from availing itself of the mortgage. 1st. A covenant not to sue is not construed into a release, except to prevent circuity of action. *Lacy* v. *Kynaston*, 2 Salk., 575. 1 Swift's Dig., 302. 2d. In that agreement the County Bank expressly reserves all its rights against the other parties to the paper, and against the Jerome Company's estate. 3d. Where there is a joint, or joint and several debt, and a covenant not to sue is made only to a portion of the debtors, it will not be held to release any of

them. *Matthey* v. *Gally*, 4 Cal., 62. So in the case of releasing the acceptor of a bill of exchange, and reserving the right to sue the drawer and other parties. *Lysaght* v. *Phillips*, 5 Duer, 106. In construing releases, general words are to be directed to particular demands, where it appears that it was intended to be so limited by the parties. *Rich* v. *Lord*, 18 Pick., 322. *Averill* v. *Lyman*, id., 346. *Rice* v. *Woods*, 21 id., 30. *Wiggin* v. *Tudor*, 23 id., 434. 4th. The Quinnipiack Bank, being bound to appropriate the mortgaged property to the payment of the claims secured by the Jerome mortgage, the subsequent agreement between Johnson and the County Bank, in regard to Barnum's liability, could not affect the right of the County Bank to the security. It would be inequitable for a court of equity to extend that agreement beyond the obvious intention of the parties.

4. Nothing found by the committee precludes Jones from recovering upon the paper held by him. It is not found that he had knowledge of the fact that Barnum owned the paper at the time it was transferred to him, and the note which he gave to Oatman was a sufficient consideration for the transfer. There is nothing to show that he does not hold this paper in good faith, or that he is acting in the matter for the benefit of Barnum. It is found that both Oatman and Barnum are expecting to derive some benefit from the suit, but it is not found that Jones has any such expectation or intention. At all events Jones is entitled to the exclusive benefit of what may be recovered beyond the amount of his note.

*Baldwin* and *Blackman*, with whom was *E. I. Sanford*, for the defendants in error.

1. The mortgage of the Jerome Company to Barnum was given for the personal security of Barnum as accommodation acceptor of the drafts of the company, and not for the security of the paper itself. This is clear from the language of the mortgage. This being so, no equity attached in the first instance to the mortgage security in favor of the holders of the acceptances, and Barnum had a perfect right to release the security, and, in concurrence with the Jerome Company,

to make the new arrangement with regard to it, which was made with the Quinnipiack Bank.    Where a mortgage is thus given, not to secure a debt but for the indemnity of a surety, the security does not become attached to the debt, but so far as the holders of the paper indorsed by the surety ever have any equitable right to the security, it is a right which accrues afterwards; growing, not out of the original contract, but out of subsequent events, such as the insolvency of the parties holden for the debt.    *Homer* v. *Savings Bank*, 7 Conn., 478. *New London Bank*, v. *Lee*, 11 id., 112.    *Thrall* v. *Spencer*, 16 id., 139.    *Lewis* v. *Deforest*, 20 id., 427.    Where the security has been released, or has passed out of the hands of the surety, before such equity has come into existence, the holders of the paper never have any equitable right to it.    In all the cases where the claim of the holders to such an equity has been sustained, it will be found that the security remained in the hands of the surety.    The after-occurring insolvency of the debtor gives rise, then for the first time, to the equity, and it takes effect upon the security only as it finds it.    Here, when the insolvency of the makers and acceptor of the paper occurred, the Quinnipiack Bank had become lawfully entitled to the security for its own benefit.*

2. The acceptances held by the New Haven County Bank were not taken until after the security was transferred to the Quinnipiack Bank, and with knowledge of the rights of that bank.    These acceptances were deposited with the County Bank as security for a temporary loan, which was soon after paid, so that the bank had no longer a right to hold them for that particular purpose.    The bank had, however, a right of

---

* In his comments on the case of *Thrall* v. *Spencer*, 16 Conn., 139, Mr. Baldwin read the condition of the mortgage in that case, which he had procured from the town records at Hartford.    As it is not stated in the report of the case, and is important in connection with the decision, I give it here.

" The condition of this deed is, that whereas said Andrus, at the request of said Barber and for his accommodation, has indorsed the following notes, all executed by said Barber to said Andrus or order, and payable at the Hartford Bank, viz. : [describing them :]  Now, if said Barber shall pay said indorsed notes according to their tenor, and said $500 on said note to said Kendall when the same falls due, then this deed to be void ; otherwise in force."        R.

option whether to return them, or substitute them for other paper held by the bank; which right of option was not exercised until the 28th of December, 1855. This was after the agreement of the Jerome Company and Barnum with the Quinnipiack Bank, which was made on the 15th of November, 1855, and after the transfer of the security by Barnum to that bank, and the discounting of the twelve acceptances, which was on the 22d of November, and the New Haven County Bank, at the time of determining to retain the three acceptances, had full knowledge of the transfer of the security to the Quinnipiack Bank. Until this right of option was exercised by the bank, the three acceptances, although in their hands, remained the property of the Jerome Company, and whatever rights the County Bank acquired to them or to the security, took effect only on the 28th of December. The bank, therefore, acquired no equity in the security, against the Quinnipiack Bank, even if such equity could attach to the security before the insolvency of the debtors.

3. The New Haven County Bank can not come in and claim the security, after having released Barnum. It is only through their claim on Barnum that they can have any claim on the security. A covenant not to sue is in equity a release.

4. The petitioner Jones has clearly no equity. He is only acting for Barnum. Barnum is to have the benefit of the suit, if anything is recovered. The note to Oatman, which was the sole consideration for the transfer of the acceptances to him, is a mere agreement to pay over the proceeds of the drafts when collected.

5. If either of the petitioners fails to make out a case, the bill must be dismissed, as it can be sustained only by showing a common interest in the petitioners.

ELLSWORTH, J. We do not discover any error in this record which calls for a reversal of the judgment below. On the contrary, we feel satisfied that the two main points made by the petitioners' counsel can not be maintained, either on principle or authority.

The first and fundamental position of the petitioners' counsel, that the deed of the Jerome Manufacturing Company to

Phineas T. Barnum, dated the 7th day of November, 1855, is, in itself, a deed of trust in behalf of creditors, who should afterwards hold the paper indorsed or accepted by him, constituting Barnum their trustee, and obliging him thereafter so to continue in spite of whatever he and the Jerome Manufacturing Company might do, although the parties were solvent, and no equities had arisen in behalf of the holders of the paper, can not, we think, be maintained as good law.  It is claimed that this principle is but the legitimate consequence of the doctrine of equity, that when collateral security is taken for the protection of a debt, it shall be made effectual therefor, not only to the person who first takes the security, but to any other person who may afterwards become entitled to the debt, or be compelled to pay it as an indorser or surety.

That there is such a general doctrine of equity we do not deny.  The authorities are too numerous to allow of any question with regard to it, and their good sense and propriety are most obvious; but when the doctrine is attempted to be applied to a case like the one before us, it is clear that an important distinction is overlooked.

We consider the deed to Mr. Barnum to have been given for the exclusive purpose of saving him harmless from the acceptances and indorsements he might give for the Jerome Manufacturing Company.  This is the very language of the deed, and it was clearly its only object.  Not a word is said about a trust or fund for third persons ; nor, we are sure, was any thing of the kind in the minds of the parties.  It may be true that, under certain circumstances, a future equity might spring up in favor of creditors, which a court of equity would enforce ; yet here no such equity has arisen ; and we remark, as it was so strongly urged upon us in the argument, that there is nothing in the phraseology of the condition of the deed—" that the mortgagor is to pay the acceptances and indorsements"—which distinguishes it from an ordinary mortgage.  The language points out the mode in which the Jerome Manufacturing Company agree to save Mr. Barnum harmless from his liabilities.  The mortgage is both in effect and form for indemnity.

If, then, the language of the deed does not create a trust, and we are to seek further for it, wherein is it to be found? How is it superinduced upon the deed, or on Mr. Barnum the mortgagee? At that time the Jerome Manufacturing Company and Barnum were solvent and in good credit. Whatever paper had their names upon it was regarded as perfectly good, and no one thought of calling it in question. Why, then, might not the indorser give up or waive his security? Why might he not let the Jerome Manufacturing Company take it back, and appropriate it to secure the Quinnipiack Bank, or any third party who would on that security loan money to the Company? We think nobody but Barnum could object to this. Certainly Barnum was not obliged to take security in the first instance, nor, having taken it, is he of course obliged to hold it. Being solvent and no new equities having as yet arisen, the parties were entirely free to act their pleasure. This appears to us to be the only just conclusion; and the idea that the original transaction between the parties to the deed stamped it with a trust, placing the property beyond their control, locking it up *in perpetuum*, or until consent should be obtained from every person who might possibly hold a piece of the indorsed paper, is one that can not be entertained for a moment. Especially is this so where the party secured is, as here, an indorser, who does not stand on the same ground as a creditor, since an indorser seeks merely, by taking a mortgage, to secure himself from a possible loss, while the creditor who takes security, originally had his eye on the security itself, as a fund for payment in case of bankruptcy.

It is claimed that, whatever may have been the intention of the parties, and whatever was their situation at the time of the execution of the deed, an equity arises at once, and continues to adhere to the property, in favor of all and each of the subsequent holders of the paper in its circulation, until it is fully paid. Not that this is expressed or implied by the language of the deed, nor that the title to the security is itself negotiable or transferable without a proper deed of conveyance, but that it is just and equitable to hold the indorser to be a trustee

for creditors, and having become so by force of the deed, he must continue to be a trustee, although he has honestly and in good faith surrendered the property to the true owner. This course of argument assumes the very point in controversy, that the legal effect of the deed is such as to create a trust by its own operation, a doctrine to which we can not give our assent.

At what time the fifty thousand dollars of acceptances and indorsements of Barnum passed into circulation, and to whom, and upon what consideration or credit, does not appear. Certainly the time is not found, nor can it with any propriety be pretended that they ever passed into circulation upon the credit of the mortgage, for the mortgage was transferred in seven days after its date by Barnum to the Quinnipiack Bank, and the transfer was immediately put upon the public records. Its original state or condition does not appear to have been known or thought of by any person besides the parties. Such was the credit of the Jerome Manufacturing Company and of Barnum, that no persons had occasion to look, nor did they in fact look for further security. Besides, if it be important, the twelve acceptances discounted by the Quinnipiack Bank are strictly within the condition of the mortgage deed to Barnum, and they were taken we know in good faith upon the credit of this real estate as a specific security, whereas the notes, or most of them, held by the petitioners, bear date in October, and therefore apparently were not embraced within the mortgage, which was given in November. How then, with so strong an equity in the Quinnipiack Bank, accompanied with the legal title which they have obtained from Charles Dorsett, a prior mortgagee, can they be disturbed in their right to the premises? It is not possible to overlook the equitable circumstances accompanying the loan of the $30,000. The mortgage deed was before them at the time, and both the mortgagors and mortgagee agreed that it should pass to the bank as security. It was transferred accordingly, and soon after the title became vested in the bank in due form of law. The parties were solvent, and no equity had as yet sprung up in favor of strangers. There was no doubt in their minds but that the indorser could

discharge any claim which he had upon the property for his indemnity, and he did fully and completely release and quit all title to it, and upon this release the money was obtained for the Jerome Manufacturing Company from the bank.

We make no question that the law is that if a creditor holds security for his debt, whether the debt be negotiable or not, if it is sold, the purchaser, nothing being said to the contrary, takes the security, if it has not been given up, as an incident to the debt. But if already delivered up, it is of necessity otherwise ; for the creditor has no longer power over it, nor is it any longer incidental to the debt. The state and condition of the security is generally a matter of inquiry by the purchaser at the time of the purchase, when of course the fact with regard to it will be learned ; and if the seller of the debt misrepresents any material fact touching it, he will be liable for damages; but the security itself does not pass. And if this is so in the case of a creditor, much more is it in the case of an indorser, who never had any right in relation to the security beyond that of being kept harmless from the debt. Indeed, he can not be injured except through his indorsement, and through that channel a third person can not reach the security, if it has been *bona fide* released and returned to the ' owner.

The foregoing doctrine is not now for the first time before our courts. In *Thrall* v. *Spencer*, 16 Conn., 139, this court carried it, at least in its application to the facts of that case, somewhat further than we propose; for there the indorser gave up to his mortgagor a part of the security after bankruptcy ; but he did it in good faith. Andrus had indorsed the notes of one Barber, and for his security had taken two mortgages, one of real estate and one of household furniture. The note passed into the hands of a third person. After the failure of the maker and indorser, Andrus in good faith released and returned the furniture to Barber, as unnecessary to his security, and Barber borrowed money upon the credit of it of Spencer the defendant. Thrall, who held the paper indorsed by Andrus for Barber, sought to obtain this furniture or its value from Spencer, but the court held, under the circumstances, that the release by Andrus was good and

valid, and should be upheld in favor of Spencer. The language of the court is very strong. " In the first place, he (Thrall) has no legal title. The first mortgage of the furniture was not made to the holders of these notes, but to the accommodation indorser for his security. Even if Andrus were still the holder of the property, the plaintiff could only reach it through the intervention of a court of equity. But he has taken the notes without making any claim for the property while Andrus retained the title. He has lain still until the latter had parted with that title and the possession, and the property had gone into the hands of a *bona fide* holder for valuable consideration. · He therefore comes too late for relief. His case does not stand upon as high ground as if the mortgage had been made to the creditor to secure the payment of the debt. It was made to an indorser, not to secure the payment of the debt, but to secure him on account of his liability as an indorser. The latter may well relinquish his pledge, provided he acts in good faith, and without any fraudulent design, before any claim is made upon him for the property."

In *Homer* v. *The Savings Bank,* (7 Conn., 478,) it appeared that the Eagle bank had conveyed a large amount of property to trustees, to secure and indemnify Mr. Homer as indorser of post notes of the bank. The notes not being paid at maturity, and the bank and Homer becoming insolvent, certain holders of the notes so indorsed brought their bill to compel the trustees to make application of the property in payment of the notes held by them. The court refused the prayer of the bill. They decided that the property was not held in trust for the payment of the notes, but only to indemnify Homer for his indorsement, and that Homer could have no claim to this fund, but on the ground of payments actually made upon his indorsements ; that the holders of post notes could claim the benefit of the trust only through Homer, and claiming through him must stand in his place and be subject to the same equity to which he would be subject were he claiming the execution of the trust ; and, consequently, that the petitioners were not entitled to the relief sought by their

bill. The court, admitting the general doctrine already stated, that security in the hands of a creditor, indorser or surety, still retained, may pass with the assignment of the debt, by operation of law, to any person who is compelled to take it up for the benefit of the mortgagor, without a formal assignment, deny that any original trust is created by a mortgage given merely to indemnify an indorser and save him harmless from his liability.

Nor is this doctrine to be regarded as called in question by the two cases cited by the petitioners' counsel, that of *New London Bank* v. *Lee*, 11 Conn., 112, and that of *Lewis* v. *DeForest*, 20 id., 440. We regard those cases as confirming our views, rather than the contrary.

In the first, H. & S. Lee, being indebted to the New London bank, procured the indorsement of S. H. P. Lee, and to secure him gave him a mortgage. The makers and indorser failed, leaving the notes unpaid. The parties still remaining in possession, taking the rents and profits, and refusing to have the premises or the rents and profits applied upon the note, the New London bank sought the interposition of a court of equity to bring about this result. The court held that the bank was entitled to the relief prayed for, and that as the mortgaged property remained in the hands of the indorser, he should pay the debt himself, or allow the bank to take his place and cancel the debt, as far as they could do it with the avails of the mortgage. Certainly a most just and equitable decision, but altogether aside from the question in the present case.

The case of *Lewis* v. *DeForest* is, in substance, the same as that of *New London Bank* v. *Lee*. It presents nothing but an attempt by an indorser of certain paper already charged with the debt and insolvent, to divert from an application to the paper indorsed by him, and then in the hands of third parties, the very security which he took, and still held, to indemnify himself for his indorsements. As he still remained liable to those very creditors, nothing could be more inequitable than his keeping back the property, and preventing the creditors from perfecting their title. The court say:—" But the

property in question remains as it was when mortgaged to Lewis. He calls upon the court to give him a perfect title, but his creditors come in, and showing his insolvency and consequent inability to pay otherwise than by means of the property in question, ask that it may be applied in fulfillment of the trust." We will not dwell at any greater length on this point in the case, being confident for the reasons stated that the petitioners are contending for what is not law.

The second point made by counsel, that the petitioners are bona fide holders of the paper they describe in the bill, and that it was taken by them upon the credit, either in fact or presumptively, of Barnum's mortgage, is, in our judgment, even less tenable.

The three acceptances held by the New Haven County Bank must be considered to have been acquired on the 28th day of December, 1855, and not before, although the paper had before that time been in their possession. On that day the bank received them in exchange for other paper which the bank held, guaranteed by said Barnum; but it is found and agreed that at that time the County Bank had actual knowledge of the mortgage to the Quinnipiack Bank and the loan of the $30,000 made to the Jerome Manufacturing Company, so that the County Bank acquired no better right or title than Barnum himself had, which certainly was none at all against the Quinnipiack Bank, but, as we view it, quite the reverse. And as to the acceptances held by Jones, he obtained them with Barnum's money, and holds them as his agent exclusively, and of course subject to every equity existing against him.

If either of the petitioners fail in establishing a title, both must fail, since the suit is brought jointly and requires a joint interest. We are persuaded however that neither of them has a valid title.

We need hardly remark that Barnum is not more estopped in this court by what took place between him and the Quinnipiack Bank at the time of the loan of the $30,000, than by what took place at the subsequent period when he recognized and confirmed a perfect title in the bank, particularly by the release deed given by him and his trustees on the 23d day of

October, 1857, and his agreement of the 6th day of August, 1856. These ought forever to conclude him.

So too, it is not easy to see how the County Bank can claim any interest in the property through Barnum, given as it was to indemnify him against his indorsements, since the bank had released him from the indorsements on the 18th day of May, 1857. The covenant not to sue was in equity a release. Barnum had at that time paid nothing on the debts, and of course could not be compelled to pay anything on them thereafter, so as by possibility to be damnified. As to him therefore, and all claiming under him, the mortgage would seem to have become inoperative. It is not necessary however to decide this point, as the other points which we have considered are sufficient for the determination of the case.

There is no error in the judgment complained of, and it must be affirmed.

In this opinion the other judges concurred; except SANFORD, J., who being disqualified by interest, did not sit.

Judgment affirmed.