CASE No. 835.

GIBBES v. G. & C. RAILROAD CO.

STATE, EX REL. ATTORNEY-GENERAL, v. SAME.

1. A mortgage of railroad property was made to one, his heirs and assigns, as trustee for bondholders. Under proceedings for foreclosure, the mortgagee being dead, another trustee was substituted and decree of foreclosure rendered. Afterwards, a petition was filed by a son of the original mortgagee, claiming to be his heir-at-law, and praying to be made a party. Petition dismissed.

2. *Doubted* whether ordinances of the convention of 1868 had any legal effect upon then existing statutes.

3. Private rights vesting during the war between the states, are protected by the constitution of the United States, and cannot be impaired by an ordinance of the state constitutional convention of 1868.

4. "An act to promote the consolidation of the Greenville and Columbia Railroad Company," provided in its 4th section for a waiver of the lien of the state on the Blue Ridge railroad property, and in its 5th section, for a like waiver of lien upon the property of the Greenville and Columbia railroad property, and in its 7th section, for the endorsement by the consolidated companies of the bonds of the two companies consolidating. The two companies not having consolidated, *held*, that the act never took effect.

5. Where an act of the general assembly provided that all the property of a railroad company should stand pledged and mortgaged to the state for the payment of certain bonds issued by such company, and guaranteed by the state, such provision constituted a statutory lien for the benefit of the bondholders as well as the state, which no subsequent statute could postpone. *Hand* v. *Railroad Company*, (1,) 12 *S. C.* 314, followed and approved.

6. Where the state guaranteed the bonds of a company, issued in exchange for outstanding mortgage bonds, under a statute which provided that the state should take and retain possession of the bonds so surrendered in exchange as "security to the state, and thereby give the state the lien under the first mortgage until all the bonds now secured by mortgage shall be retired;" all of the mortgage bonds not having been surrendered or exchanged, *held*, that the state could assert the lien of the mortgage bonds so held by her, together with the coupons thereto attached, as of equal rank with the mortgage bonds not exchanged.

7. A statute authorizing the guarantee by the state of certain bonds of a railroad company to be secured by a statutory lien, was passed in 1861, and the bonds issued and guaranteed under the authority of this act, bore

the caption "Confederate States of America." In 1866, another act was passed which extended the operation of the act of 1861, and authorized the issue of new bonds in exchange for the C. S. A. bonds, also certificates of indebtedness to pay interest past due on the C. S. A. bonds, and bonds for other indebtedness, all of which were to be in like manner guaranteed. *Held*, that the C. S. A. bonds, not surrendered, were of superior rank to the bonds issued under the act of 1866, but those issued under act of 1866, in exchange for bonds surrendered, could claim a lien only under the latter act, and stood upon the same footing with all other bonds issued under the act of 1866. *Hand* v. *Railroad Company*, (5,) 12 *S. C.* 315 approved.

8. Under an act of the legislature passed in 1869, certificates of indebtedness were authorized to be issued by a railroad company for funding interest due upon its bonds which were secured by a lien under an act of 1866, and which lien was extended by the later act to cover these certificates of indebtedness. *Held*, that this was a mere substitution, and not a payment, and that the lien of these certificates was superior to that of a mortgage executed between 1866 and 1869.

Before PRESSLEY, J., Richland, October, 1878.

The facts of the case are fully stated in the Circuit decree, and again in the opinion of the court. The Circuit decree is as follows:

The reports of the referee and the acts of assembly furnish the facts of these cases, as follows, to wit:

In January, 1854, the defendant mortgaged all its property to C. M. Furman, trustee, to secure $800,000 of its bonds, payable in 1862, 1863 and 1864. Before they became due, it had incurred $100,000 other debts; and to enable it to provide for these debts and the mortgage bonds, then almost due, the state, by act of 1861, agreed to guarantee $900,000 new bonds of defendant, and further provided that the first mortgage bonds, which should be exchanged for guaranteed bonds, should stand as security to the state, and thereby give it the lien under the first mortgage until all these bonds should be retired.

By said act the state's guaranty was to be endorsed on $250,000 of the new bonds before any of the old were taken up, and thereafter the disparity was to increase so that only $400,000 of the old bonds would be held by the state, when her guaranty would be on $700,000 of the new bonds.

This proposed guarantee was made, during the war, up to $700,000, and the guaranteed bonds then issued were entitled " Confederate States of America."

According to the act, they constituted a mortgage to the state on the whole estate of the defendant for its faithful performance of its contract "and the payment of such obligation." The defendant was also required, after the three years, to set apart two per cent. on the amount of the guaranteed bonds for retiring the same.

This was not done, nor did defendant pay, during the war, the interest on either the first mortgage bonds or those guaranteed.

In 1866, the said interest being still unpaid, and the defendant owing $600,000 other debts, besides interest, the state passed an act which authorized its guaranty on $1,500,000 new bonds and certificates of indebtedness of defendant, which were to be applied as follows, to wit:

$700,000 to be exchanged for that amount of guaranteed bonds, which have been issued during the war, and entitled " Confeterate States of America ;" $200,000 to be exchanged for that amount of first mortgage bonds then outstanding; $350,000 to the payment of interest on the guaranteed and first mortgage bonds, and $250,000 to compromising the remaining debts of defendant at one-third thereof. To the whole of the $1,500,000 bonds and certificates guaranteed under this act, the mortgage of the act of 1861 was equally extended.

The report of the refereee shows that holders of $241,000 of first bonds did not exchange them for those authorized by this act; only $200,000 of these should have remained outstanding when the $900,000 guaranty of the state was complete; but of the guaranteed bonds which were executed, $35,000 yet remain unused in the hands of the comptroller-general, and thus the failure to comply with the terms of the act is *reduced* to $6000 outstanding first mortgage bonds, which are contested by defendant without sufficient proof.

As to how much of the $700,000 guaranteed under the act

of 1861 was exchanged for those authorized by act of 1866, there is no information in the referee's report or the evidence.

The defendant being again unable to pay interest on its guaranteed and first mortgage bonds for the six months ending July 1st, 1868, the state, by act of February, 1869, authorized its guaranty on $50,000 certificates of indebtedness, to be used for funding said interest, and to these certificates the statutory lien of 1866 was extended.   In May, 1867, the defendant executed to C. D. Melton, trustee, a second mortgage, to secure $1,500,-000 bonds and certificates of indebtedness thereafter to be issued, and to bear date as issued.

There is no proof before me as to the date of any of said bonds, but it is quite certain that it was after the act of March, 1871, which, to promote the consoldation of the defendant with the Blue Ridge Rail[road] Company, purported to make all statutory and other liens, except existing mortgage encumbrances, subsequent to the said second mortgage.

The 7th section of this act requires that the bonds to be issued by the defendants under its second mortgage shall be endorsed by the proposed consolidated company, but the consolidation was not made, and consequently such of said bonds as were issued are without said endorsement.

Upon the facts above stated, I hold :

1. That the statutory liens, under the acts of 1861, 1866 and 1869, were securities for payment of the bonds therein authorized, not mere indemnities to the state, and therefore it had no right to waive them in favor of the second mortgage.

2. That said waivers, if lawful, never took effect, because the endorsement of the second mortgage bonds by the consolidated company was a condititon precedent, and not complied with.

3. That the debts due for necessary repairs, materials and labor for operating the road, pending the litigation in these cases, and which produced income, applied to the payment of interest on the guaranteed and first mortgage bonds, are first to be paid out of the property of defendant.

4. After payment of said debts, the first mortgage bonds outstanding, and those held by the state, with all unpaid interest thereon, are the first lien on said property.

5. That the portion of the state under this mortgage is for its own indemnity, and is, therefore, equitable assets applicable *pro rata* to all the bonds it has guaranteed under the acts of 1861, 1866 and 1869.

6. That such of the bonds, if any, guaranteed under act of 1861, as were not exchanged under act of 1866, are the next lien on said property.

7. That the exchange of bonds guaranteed under act of 1861 for those of the act of 1866, was in acceptance of all the provisions of the latter act, and all the bonds issued thereunder have equal rights, and rank next to those, if any, under act of 1861, which were not exchanged; and after those of 1866, the bonds issued under act of 1869 rank next.

8. The second mortgage bonds which have been reported as issued, or which may hereafter be shown to have been lawfully issued, are entitled to the surplus assets after payment of those secured by first mortgage and the said statutory liens.

It is adjudged and decreed, that the foregoing conclusions of law and fact do stand as the judgment of this court. Further, that all orders heretofore made by me, at chambers, and which in my order appointing the receiver, were reserved for this decree, do stand confirmed as part of the same.

It is further ordered, that these cases be referred to the master to take the testimony and report what debts for labor, materials and repairs, not heretofore ordered to be paid, are entitled to payment according to this decree.

Also, what first mortgage bonds are held as indemnity by the state, and the amount of interest due and unpaid thereon.

Also, what bonds guaranteed under act of 1861 were not exchanged for those under act of 1866.

Also, what amount of guaranteed bonds were issued and are now outstanding under the latter act, and what under act of 1869.

Also, what second mortgage bonds, not heretofore proved, are entitled to share in the surplus.

The said master is hereby authorized to apply at chambers for leave to advertise all claimants herein provided for to pre-

sent and prove their claims, and for such further orders as may be necessary to effect the purposes of this reference.

From this decree appeals were taken by H. H. De Leon, the trustee under the first mortgage, by W. A. Clark, trustee, under the second mortgage, by bondholders under act of 1861, and by B. B. Furman. The grounds of their appeal are fully considered in the opinion of the court.

*Messrs. J. N. Nathans* and *A. G. Magrath,* for H. H. De Leon, trustee.

Under the act of 1866, the state waived or relinquished the lien under the mortgage reserved to it in the first section of the act of 1861. The state had full control of this mortgage lien, which was wholly for the indemnity of the state. The statutory mortgage to secure the guaranteed bonds enured to the holders of such bonds. The legislature, in 1866, did not doubt the validity of the bonds of 1861, because of their date or caption; the doubt was as to the validity of the legislature which passed the act. A change of circumstances made proper a change in the act giving state assistance. Some things were omitted, others added. The legislature then thought a re-enactment necessary, and what they did not re-enact they intended to dispense with. The act of 1866 expresses, in itself, a clear intention that it should be a substitute for the act of 1861. See, too, ordinances of convention. *Gen. Stat. LX.* The act of 1869, by re-enacting act of 1866 only, treats it as a substitute for act of 1861. And yet the rights given under act of 1861 were preserved in act of 1866 in priority to other liens there created. 22 *Cal.* 414; 21 *Wis.* 370.

If the lien under the first mortgage of this company reserved to the state in the act of 1861, is a subsisting indemnity for the protection of the state against liability as guarantor on the bonds of the company, then such indemnity is limited to the amount of principal and interest due on bonds guaranteed by the state under the act of 1861, for which guarantee said indemnity was given, or to the amount of principle and interest due on bonds substituted for said original bonds under the act of 1866. An

indemnity held by a guarantor is limited to protecting him against liability.   1 *Jones on Mort.*, §§ 380, 384; 15 *Gray* 521.

If the mortgage bonds retired under the act of 1861, and in possession of the state, are a subsisting security for its indemnity against liability as guarantor, and entitled to share ratably with similar bonds outstanding in the proceeds of the property covered by the mortgage, then interest upon the bonds so held as indemnity, can only be claimed from the time the company suspended payment of interest on the guaranteed bonds for which said bonds were exchanged.   21 *Wall.* 622.

*Messrs. Melton & Wingate,* for W. A.. Clark, trustee.

The first and second conclusions of law present the question, whether the act of 1871 was effectual to postpone the lien held by the state, so as to give priority to the second mortgage; and this will be conceded, unless it appears.   (1.) That the liens were not merely an indemnity to the state, but operated as security for the payment of the bonds to the holder; or, (2.) That the provision of the seventh section, requiring the consolidated company to endorse the bonds then "held" by the two companies, was a condition precedent upon which the waiver depended. ·

I. The order of the propositions being inverted, we inquire whether there was a condition precedent.   What bonds were then held?   There is no proof of any being held by either company.   The purpose of the act was to promote the consolidation of the companies.   The waiver was to enable the companies to secure this end, and must have preceded the consolidation.   A condition precedent is one which must be performed before the thing to be obtained can be effectuated.   It is usually imported by words clearly mandatory—by proviso, by limitation of time, by negative terms, or by language denoting an intention to make it essential to the thing in view, and clearly to suspend the attainment of this thing until the requirement be performed. But the requirement here is wholly independent of other provisions, and is purely directory.   *Bouvier's L. Dict.; Cooley on Const. L.* 74, 84; *Potter's Dwar.* 220, *et seq., and notes* 27–29; *Sedg. on Stat. & Const. L.* 369, *et seq.*

II. Did the state have the right to waive her liens in favor of the second mortgage? This will affirmatively appear unless the acts of 1861 and 1866, creating and preserving the liens in question, are of such effect as to bind subsequent legislatures, and to this extent limit the exercise of the sovereign power of the state. Such limitations are not favored. *Bl. Com.* 90. *Const. U. S., Art. I.,* § 10, applies to contracts made by a state, but the presumption is that the state was making laws, not contracts, unless the contrary plainly appears. If there is no contract in the acts of 1861 and 1866, between the state and the bondholders, then the validity of the act of 1871 must be conceded. The aid granted here had been before extended to other railroads. It could not have been within the contemplation of the parties to extend the lien which it was the object of the act to remove. Public credit was then the highest security known to the commercial world. To this pledge alone the bondholder then looked; the doubt is an after-thought. The lien to the state as indemnity against its guaranty, was wholly independent of the contract between the company and the bondholders, debtor and creditor. The debt existed first; the lien was afterwards created. 18 *Ohio* (*Gris.*) 35; 29 *Conn.* 25. The right asserted in behalf of the guaranteed bondholder to a participation in the benefit of these liens, does not arise out of express contract. On the contrary, it is asserted as a right founded upon an equitable principle, which, as it is said, gives to the creditor the benefit of any security held by the surety for his indemnity and for the discharge of the debt. This principle, established by a long current of decisions, is conceded, but it remains to be considered whether it partakes, to any extent, of the nature of the contract, so as to vest in the guaranteed bondholder a right beyond the power of legislative control; or, as between parties of any character, a right which attaches to the security in the first instance, in such a way as to place it beyond the control of the parties to the contract; that is to say, the principal debtor and his surety.

This principle has been often referred to the same considerations of equity which have given rise to the doctrines of subrogation and of contribution. In a sense this is true; but they are not identical in their operation and effects. Indeed, it is

rather the converse of subrogation, and the cases in support of these doctrines are quite distinct; the exposition of the doctrine of subrogation appearing in a current of authorities commencing with *Wright* v. *Morley*, 11 *Ves.* 12; that of contribution finding leading authority in *Dering* v. *Earl of Winchelsea*, 1 *Lead. Cas. Eq.* 78; and the doctrine under discussion, which is not distinguished by a name, unless we might import into it that of *substitution*, is traced to the ancient case of *Maure* v. *Harrison*, digested in 1 *Eq. Cas. Abr.* 93, *K.* 5. The argument will not, at first thought, be traced to the same principle as that which entitles the surety to the right of subrogation; for this is referable to those deliverances of conscience and morals which afford especial protection in equity to him who stands bound merely for accommodation, and without valuable consideration or benefit to himself, and which, upon the same ground, entitles the surety who has paid the debt to have contribution of his co-surety— the equity in each case having become so familiar and well-established as to be regarded rather as a legal principle and enforced as a legal right. But in the last analysis, the principle of which we are in search, may, in its primary application, be traced to the same source, and be found in the conscientious regard of the court for the protection of the surety, and as an incident merely. This protection appears forcibly in several of the later cases. 10 *Leigh* 206; 1 *Lead. Cas. Eq.* (3d *Am. ed.*) 164; 12 *Leigh* 387; 18 *Ohio* 46. Apparently in conflict are 9 *Cranch* 43, 292. But we assert that any equity to the creditor arises subsequently, and because of certain conditions, the insolvency of debtor and surety, or danger arising of a fraudulent diversion of the security. See 1 *Johns. Ch.* 119, 129; 19 *Ves.* 349; 2 *Johns. Ch.* 418; 1 *Paige* 298, 615; 3 *Saund. Ch.* 428. These are the authorities upon which the notion of a trust is founded; but they do not touch the question of the surety's right to surrender the security to the debtor, if done in good faith and before insolvency. The State of South Carolina is not insolvent, and cannot be, so long as there is property to be taxed and persons to pay. But there is no question of contract here; it is only an equity. Cases above cited, and 14 *Ves.* 169; 4 *Johns. Ch.* 149. Not being a contract, its repeal by the legislature violates no constitutional provision; being for

the indemnity of the surety, it is for him to determine the kind and measure of his indemnity, if he shall deem it to his interest to hold it at all.

This equity of the creditor or surety can attach only to securities in hand, and cannot attach to those which have been disposed of in good faith. 16 *Conn.* 139; 29 *Conn.* 25. Before resort was had by the creditor to this security, the second mortgage was created, and their contract is now superior to this mere equity. The case of *Hand* v. *Railroad Company,* 12 *S. C.* 314, was different from this case; there the bond constituted a lien.

*Mr. S. Lord, Jr., Mr. J. H. Rion,* and *Mr. W. H. Brawley,* contra.

March 24th, 1880. The opinion of the court was delivered by

McGOWAN, A. J. It will contribute to a clear understanding of these cases to make a short statement of facts out of which the questions arise.

The Greenville and Columbia Railroad Company was incorporated by acts of the general assembly in 1845–6 and 1849, for the purpose of building a railroad from Columbia to Greenville, with branches to Abbeville and Anderson. In 1854 the company executed a mortgage to Charles M. Furman, Esq., trustee, of their entire railroad, including "the bed and superstructure, the materials used in the construction, the iron, stations, stationhouses, depots, fixtures, workshops and machinery, rolling stock and all the land and real estate belonging to said company," with two inconsiderable exceptions, not important here, to secure bonds of the company which had been and were about to be issued, to *the amount of* $800,000, for the purpose of completing the road.

In 1861 these bonds, secured as aforesaid, were about to fall due, viz., in 1862, 1863 and 1864. At maturity they might be sued, and the company desired further time. They also desired that the state, which was a large stockholder, should in some way contribute an equivalent for the assessment which had been exacted from the private stockholders, and the following scheme was adopted: The property of the company was improved in value since the mortgage was executed, and the debt was enlarged

by over $100,000, and the time for payment was extended twenty years upon the whole $900,000, which was to be secured by the guaranty of the state, and another lien to be declared by statute to the state in substitution of the first mortgage. The mortgage was to be taken up and the statutory lien become the first. To accomplish these purposes was passed the act of January 28th, 1861, entitled "An act to lend the name and credit of the state to the Greenville and Columbia Railroad Company, in relation to the re-adjustment of their debt." 12 *Stat.* 885. This act authorized the comptroller-general to endorse bonds of the company to the amount of $900,000, and declared "that as soon as the comptroller-general shall have made any such endorsement on any bond, the whole estate, property and funds within the state which the said company may then possess or shall afterwards acquire, shall thenceforth stand pledged and mortgaged to the state, without any further act or deed on the part of the company, for the faithful and punctual performance on the part of the said company of such contract, and the payment of such obligation in priority and preference of any other debt which the said company may then or any other time owe, except the bond debt now secured by mortgage, which shall enure to the benefit of the state, as hereinafter provided," &c. These endorsed bonds were not to be used by the company for any other purpose than for "funding the debt of $100,000 now due by the company on notes and accounts, and of taking up the bonds of the company already issued and now secured by mortgage," &c. At that time the war was going on, and the transfer of the mortgage debt to the statutory lien went on slowly. Part of the mortgage bonds were never exchanged, and the $700,000 which were issued under the act bore date during the war, and were entitled "Confederate States of America."

In 1866 the war was over, but, as there might be difficulty about the bonds which had been issued during the war, it was determined to re-issue them with another caption; to renew the authority contained in the act of 1861 for issuing the $200,000 which had not been issued, and to put into the form of certificates of indebtedness the interest which had accrued, amounting to $350,000. To accomplish these purposes the act of 1866 was

passed, and thus far the act was substantially a re-enactment of that of 1861, adding nothing to the debt; for the lien was originally for $900,000, as well as the interest which might accrue. But the company had incurred new debts to the extent of $600,-000, and the occasion of the passage of this act was taken to make a provision for funding that debt by a compromise of one for three. To do this required $250,000, and, by the fifth section of the act, certificates of indebtedness to that amount were authorized and guaranteed. The act did not assume to create any new statutory lien, but to re-enact and *extend* that of 1861 so as to cover the whole issue originally authorized and interest, and also the new element of $250,000, and was entitled " An act to alter and amend an act to lend the name and credit of the state to the Greenville and Columbia Railroad Company in the re-adjustment of their debt." 13 *Stat.* 395, 427.

In 1867, the company executed a second mortgage of their entire road and property to Cyrus D. Melton, Esq., as trustee, to secure other bonds of the company to the extent of $1,500,000. The state neither authorized her guaranty nor declared a statutory lien to secure these bonds. The mortgage itself, after reciting the first mortgage, the guaranty of the state and the statutory lien arising therefrom, declares in terms that the mortgage " is to be subject to the first mortgage and the statutory lien aforesaid." [See mortgage.]

In 1868, the convention which framed the constitution passed an ordinance which declared " suspended and inoperative, until ratified by the general assembly, all acts, or pretended acts of legislation purporting to have been passed by the general assembly of the state since December 20th, 1860, pledging the faith and credit of the state in aid of corporations, &c. 14 *Stat.* (*Ordinances,*) 35.

In 1869, the legislature, upon condition that the company would release its right of exemption from taxation, re-enacted the act of 1866, and a further endorsement of bonds to the amount of $50,000 was authorized to be applied to take up the interest of the mortgage and guaranteed debt becoming due from January 1st, to July 1st, 1868. 14 *Stat.* 183.

In 1870, under "An act to provide a sinking fund and the management of the same," the controling interest owned by the state in the stock of the company was sold, and shortly after a new board of directors assumed control of the affairs of the company, and, it is alleged, issued a large amount of guaranteed bonds without complying with the terms and conditions imposed by law.   14 *Stat.* 388.

In 1871, the legislature passed an act entitled "An act to promote the consolidation of the Greenville and Columbia Railroad Company and the Blue Ridge Railroad Company," the fifth section of which, it is claimed, postponed all statutory liens prior to that date in favor of the second mortgage.   14 *Stat.* 590.

These are the acts under which this litigation arises.   There is no testimony before us.   The company not being able to pay all their obligations, questions of priority of lien soon arose between the holders of guaranteed bonds and the second mortgage bonds, the latter claiming that the act of 1871, last above referred to, postponed all statutory liens in favor of that of the second mortgage.   The case first stated—James S. Gibbes *v.* The Greenville and Columbia Railroad Company and others—was instituted in 1872 by guaranteed bondholders for themselves and other creditors to foreclose mortgages, for relief, &c.   The other case mentioned was in the nature of a cross-action by the attorney-general to protect the interest of the state, foreclose mortgage, enjoin creditors, for receiver, &c.

In these cases, heard together, Judge Melton, in 1872, appointed John S. Green, referee, enjoined the creditors of the company from suing, ordered them called in to prove their demands, and that the pleadings should be amended by making Charles M. Furman, trustee under the first mortgage, and C. D. Melton, trustee under the second mortgage, defendants.   The referee called in all creditors of the company, and November, 1872, made his report showing the different classes of bonds, so far as they were presented, in their priorities, &c.   In 1874, Judge Carpenter extended and enlarged the reference.   In May, 1878—C. M. Furman and C. D. Melton, both having died in the meantime—Judge Shaw ordered that the pleadings should be

amended so as to make parties H. H. De Leon, trustee, substituted for C. M. Furman, and W. A. Clark, substituted trustee for C. D. Melton. The pleadings were so amended, and the cases heard on the merits by Judge Pressley, who declared the priorities, appointed a receiver to take charge of the road, and ordered another reference. To this decision various classes of creditors have filed exceptions and the appeal comes to this court. The brief does not contain any further report from the referee or exceptions thereto. The number and amount of the different classes of bonds, or whether they were issued according to law, do not appear. This court cannot see the bearing of its judgment upon the actual facts, and can do no more than to announce the principles upon which the final report should be framed.

The cases on Circuit were fully argued, and, as the judge states, "without any objection from any one that there was want of proper parties;" but it appears that after his decree was rendered, one Bolivar B. Furman, *ex parte,* filed his petition in re James S. Gibbes *v.* The Greenville and Columbia Railroad Company et al. claiming that as the first mortgage conveyed the property of the mortgagor to "*C. M. Furman, his heirs and assigns,*" the petitioner, who is the heir of the said Furman, [we suppose eldest son] was and is invested by descent with the legal title to the property and trustee as successor, and insisting that he is a necessary party to the proceedings, and should be impleaded as a defendant. Judge Mackey, to whom the application was made, dismissed the petition, on the ground that "the petitioner has no interest in the subject matter or the issues involved." From that order petitioner appeals, and raises the first question in the case.

The claim of the petitioner comes late, and is purely technical. The intention was to make C. M. Furman the depositary of a personal confidence in the nature of a passive trust; no beneficial interest or transmissible estate was conveyed to him by the mortgage, which was only a security for the bondholders. It was competent for the court, at the instance of the parties in interest, to appoint a trustee as successor of Mr. Furman. Judge Shaw appointed H. H. De Leon, and ordered him made a party.

Q

The order dismissing the petition of Bolivar B. Furman is affirmed and the appeal therefrom dismissed. *Hill on Trustees* 285, 291; *McNish* v. *Guerard*, 4 *Strob. Eq.* 79; *Devant, Trustee,* v. *Guerard*, 1 *Spear* 242; *Ex parte the Greenville Academies*, 7 *Rich. Eq.* 478; *Ex parte Mayrant, Rich. Eq. Cas.* 1; *Ex parte Knust, Bail. Eq.* 489; *Dean* v. *Landford et ux.*, 9 *Rich. Eq.* 423.

The next preliminary inquiry is, whether the ordinance of the constitutional convention passed in 1868, declaring inoperative the acts of 1861 and 1866 until re-affirmed by the act of 1869, affects, by changing the date of lien or otherwise, the rights of the parties in these cases. It is not easy to define the powers which a convention of the people may rightfully exercise. It has been doubted whether any act of mere legislation in a state having a constitution can be passed by a convention called for a particular and different purpose. The body is not constituted with two houses, and in other respects lacks the organization necessary for ordinary legislation. The convention of 1868 was not called for a purpose fairly embracing the subject of this ordinance, which was never submitted to the people. But from the view taken by the court upon another ground, it is not necessary to consider here the abstract question of the power of the convention. *The State, ex rel. McCrady,* v. *Hunt*, 2 *Hill* 1.

It is not competent for one legislature, which is the regular law-making body, to repeal acts of a previous legislature under which private rights have vested, and, clearly, the convention had no higher power. The ordinance in this respect derives no force from the anomalous condition of the state growing out of the war. It is probable, from the time fixed from which the suspension was to commence—"*December 20th,* 1860 "—that the ordinance was made on the idea that all acts of the legislature after secession were void. If so, such assumption was unfounded. *Keith* v. *Clarke*, 7 *Otto* 477. Private rights vested during the war are recognized as entitled to the protection of the constitution of the United States. A provision of the state constitution itself which impaired the obligation of contracts made during the war, has been declared null and void. *Calhoun* v. *Calhoun*, 2 *S. C.* 283; *Cochran* v. *Darcy*, 5 *S. C.* 125.

The ordinance was and is without the force of law. So much of the act of 1869 as re-affirmed the act of 1866 was unnecessary, and the rights of the parties must be determined as if the ordinance never existed.

The most important question in the case is that made by the holders of bonds under the mortgage of 1867, known as the second mortgage. It will be remembered that, in the order of time, the date of that mortgage, and certainly of all bonds held under it, is subsequent to the statutory lien created by the act of 1861, amended by the acts of 1866 and 1869. But it is earnestly urged that the *fifth* section of the act of 1871 *postponed the statutory lien* so as to leave the mortgage of 1867 next after the first mortgage. The company only executed two mortgages; all other liens were declared by statute; and the effect of postponing the statutory liens would be to leave the mortgages standing in the order of their dates. The act of 1871 is entitled " An act to promote the consolidation of the Greenville and Columbia Railroad Company and the Blue Ridge Railroad Company," and sections four, five and seven bear upon the point, and are as follows:

" SEC. 4. That in view of the consolidation of the Greenville and Columbia Railroad Company and the Blue Ridge Railroad Company, the action of the said Blue Ridge Railroad Company in making the bonds authorized under the act of September 15th, 1868, and of the comptroller-general of the state in endorsing the same, and thereby pledging the faith and funds of the state to the payment of said bonds, is hereby ratified and confirmed; and that the making and execution by said Blue Ridge Railroad Company and said other companies of the mortgage aforesaid to Henry Clews, Henry Gourdin and George S. Cameron, to secure the payment of the bonds aforesaid, is also ratified and confirmed, and said mortgage is declared to be a lien prior to that of the state on all property described in said mortgage, and on the entire line of the road aforesaid, and on all the properties of said several companies, or which they or either of them, may hereafter acquire; but nothing in this act contained shall be construed to divest the state of its lien on the estate and property of the said several railroad companies, or of either of them, for its

endo rsement of the bonds aforesaid, but said lien is postponed to and declared to be subject and subordinate to that of the mortgage hereinbefore mentioned, to Henry Clews, Henry Gourdin and George S. Cameron, trustees.

"SEC. 5. That all statutory or other liens or lien, encumbrances or encumbrance, equities or equity, except the mortgage encumbrances now upon the property, assets, effects, rights and franchises of said Greenville and Columbia Railroad Company, or any part thereof, and also except the mortgage herein authorized, shall be and are, or is hereby made subsequent to the mortgage encumbrances now in existence thereon and subsequent to the one herein authorized, so that the holders of the bonds secured by said mortgages, or either of them, shall have a lien and security as between each other, according to the time said mortgages have been or shall be recorded, and a prior lien to all other liens or encumbrances whatsoever, any law or laws to the contrary notwithstanding.

"SEC. 7. That after the consolidation of the Greenville and Columbia Railroad Company with the Blue Ridge Railroad Company, the bonds now held by the Greenville and Columbia Railroad Company and the Blue Ridge Railroad Company, shall be endorsed by the consolidated company."

It does not appear that this act was ever accepted by the Greenville and Columbia Railroad Company or its creditors, or went into operation, in whole or in part. Indeed, the contrary appears. The company executed the second mortgage, which, in its terms, recognizes as superior the first mortgage and the statutory lien. The title of the act has been stated. In the usual manner it is divided into sections, but they all relate to the one subject of the act; otherwise there would be two or more acts in one under a false name, and violating the provision of Section 20, Article II., of the constitution, which declares that "every act or resolution having the force of law shall relate to but one subject, and that shall be expressed in the title." But we think that all the sections of this act, properly construed, have reference to the subject expressed in the title. The *fourth* section provides for the waiver of a statutory lien on the Blue Ridge railroad, the property of one of the companies to be consolidated.

The *fifth* section provides for the waiver of the statutory lien on the Greenville and Columbia railroad, the property of the other company being prepared for consolidation. The *seventh* section provides that " after the consolidation the bonds now held by the Greenville and Columbia Railroad Company and the Blue Ridge Railroad Company shall be endorsed by the consolidated company." Are these sections each an act independent of the others, or all parts of one whole? The object as stated, and as appears from the act itself, was to consolidate the two companies. Considered in reference to its purpose, the act is a unity with several parts. Each section brings its contribution to the end in view. If the taking effect of the charter of the consolidated company and its endorsement of the bonds are not technically *conditions precedent* to the waiver of the lien, they are provided for by the same act and are parts of one plan, and must stand towards each other in the relation of mutual and dependent provisions. In the order of time, of course, the companies had to be consolidated before such consolidated company could endorse the bonds; but is it not apparent that the endorsement, though later in the order of time, was to be the counterpart and consideration of the waiver? The fact that the parts are in different sections does not alter the case. The division into sections is purely arbitrary. Part of an act, isolated and disconnected from the context, may defeat instead of give effect to the intention of the law-maker. The fifth section of the act of 1871, which was inserted as part of a plan to consolidate the two companies, cannot, after that purpose has failed, be enforced for the sole and different purpose of effecting priorities in one of said companies. The object of the act having failed, each and all of its parts also fail.

But if the fifth section of the act of 1871 is to be considered as a law in itself, independent of the other sections and the purposes of the act, was it within the power of the legislature to pass such a law? We need not repeat what we have said upon the subject of the infringement of rights through the forms of law in connection with the ordinance of the convention. It has, however, been earnestly and ably argued that these bondholders contracted for no other security than the obligations of the company and the guaranty of the state; that they will still have that if

the lien is postponed; that they never had any vested interest under the statutory lien, which was a collateral indemnity created by the state for the sole purpose of securing herself, and, as it was a creature of the state, solely to indemnify the state against loss on the guaranty, the state could waive or relinquish it at her pleasure. The principle contended for is that a security given for the protection of the surety may be waived by him, and the creditor has no such interest in the transaction that can supply the want of privity of contract.

We consider that the principle, as stated, has no application to this case, and might be admitted without affecting the result here. It will presently appear that the statutory lien in this case was not given exclusively for the indemnity of the guarantor, but to secure the payment of the debt. The general rule undoubtedly is: That when the principal debtor has given the surety a security against his liability, the creditor is entitled to the benefit of the security. 1 *Lead. Cas. Eq.* 196; *Homer* v. *Bank,* 7 *Conn.* 483; *Jones* v. *Quinnipiack Bank,* 29 *Conn.* 25.

There are cases in which the principle may seem to be modified, but, when carefully examined, it will be found that they stand on their peculiar circumstances, as where the security was given *after* the original agreement for the sole purpose of indemnifying the surety and not for the payment of the debt. The case above cited of Jones v. Bank, which, in the argument, was relied upon by both sides, may be taken as declaring both the rule and the modification. The principles announced in that case are the following:

" When a mortgage is given *to secure a debt,* whether the debt be in a negotiable form or not, a transfer of the old debt transfers in equity the security, if the security has not previously been surrendered by the creditor." " But when a mortgage is given, not to secure a debt, but to *indemnify a security,* then the security does not, in the first instance, attach to the debt, as an incident to it, but whatever equity may arise in favor of the creditor with regard to the securities arises afterwards, and comes into existence only upon the insolvency of the parties holden for the debt."

Apply the principles here announced to this case, and the whole point resolves itself into a question of construction: Whether the statutory lien was given *to secure the debt* or to *indemnify the guarantor?* Did or did not the bondholders contract to secure their debt? It seems to the court that there can be no doubt upon that point. They held a perfectly good security under the first mortgage. The state passed an act, and thereby proposed to them to exchange their mortgage security for the statutory lien. They did so, and the terms of the act constitute a contract between the company, the bondholders and the state, as clearly as if a new mortgage had been executed by the company, and the state had guaranteed the bonds as additional security. That contract was made at the time the bonds were guaranteed, and as part of the original arrangement, and each party has a right to insist upon its terms. Was it exclusively to indemnify the state or to secure the debt to the bondholders? It is true, it was *to* the state, as the first mortgage was made *to* C. M. Furman, but expressly and in terms *to secure the payment of the debt.* The act of 1861 has on the face of the covenant these words: "For the faithful performance on the part of the said company of such contract, and *the payment of such obligation in priority and preference of any other debt which the said company may then, or at any other time, owe, except the bond debt now secured by mortgage.*"

The act of 1866 has these words: "That the statutory mortgage contained in the second section of the act of which this act is amendatory shall constitute a lien on all the property, &c., to secure *the payment of the principal and interest of the whole debt of* $1,500,000 *thus guaranteed in the adjustment of the original mortgage and guaranteed debt of said company, also the debt of* $600,000 *and interest thereon, which is now secured by mortgage.*" And the act of 1869 declares "that the statutory lien is hereby extended to cover the additional sum of $50,000 herein provided," &c.

Can there be any doubt, from the terms of these acts, that the statutory mortgage was not given exclusively to indemnify the state as guarantor, but, in express terms, to secure the debt to the creditor? This subject has lately received exhaustive considera-

tion by this court in the case of *Hand* v. *Savannah and Charleston Railroad Company*, 12 *S. C.* 314, and it is quite unnnecesary to say more than to repeat the words of Chief Justice Willard, as the organ of this court in that case, in which the facts were less plain than they are in this:

" In all these cases the intention is clearly expressed that the security taken shall be for the payment of the bonds. It is in no case said that it is taken for the special indemnity of the state as endorser. That is undoubtedly implied, but the direct provision is for the payment of the bonds. A provision for the payment of the bonds is primarily a security for those holding the bonds. It is always so in equity, and at law when its forms permit it." (*P.* 342.) " The foregoing conclusions establish the proposition that the bond and coupon holders took a mortgage or lien upon all the property of the old company intended by that act to be subjected to such mortgage or lien, which the legislature had no right to destroy or postpone, as such attempt was in violation of the provisions of the constitution of the United States and of this state forbidding the passage of a law impairing the obligation of a contract." (*P.* 356.)

The next question is as to relative priorities of the different classes of bonds guaranteed by the state and held under the first mortgage. It is not questioned by any of the parties that the first mortgage of 1854 is the first lien upon the property of the company to the extent of the bonds that have never been exchanged, but are still outstanding in their original form. But it is not conceded that this is true of that portion of those bonds which were exchanged for guaranteed bonds, and are now in the possession of the state. It is insisted that the state, having guaranteed other bonds issued by the company in lieu of them, which substituted bonds are interest-bearing obligations, that the bonds in the possession of the state, are, in effect, paid, and should be regarded as either canceled or held as cumulative security for a particular class of the guaranteed bonds. The statutory lien was intended as a substitute for the first mortgage, and if all the bonds had passed under the statutory lien, the first mortgage would have become *"functus officio,"* and the statutory lien taken its place as the first, and, in that event, the bonds

received in exchange would have died with the mortgage. The exchange, however, was not made of the whole, but only of part. At first view it would seem that the same result should follow as to the part exchanged, and that the bonds taken up should be regarded "pro tanto" paid, and the mortgage canceled, except so far as was necessary to cover the bonds still outstanding. On the other hand, there may have been good reasons for keeping alive the lien of these transferred bonds under the mortgage until the whole amount was transferred. But be that as it may, the words of the act are too plain and explicit to admit the view that they are to be considered paid. The act declares expressly that the bonds thus taken up and deposited with the " president of the bank shall stand as security to the state, and thereby give the state the lien under the first mortgage until all the bonds now secured by mortgage shall be retired." All the bonds secured by mortgage have not yet been retired, and we cannot declare a result directly in the face of the act. It is not conceived that the outstanding mortgage bondholders have any right to complain of this. They accepted the mortgage security, knowing that it covered the whole $800,000, and there is little equity in the claim that as each bond passed from under the mortgage the value of the mortgage to that extent must be enhanced for their benefit. All the bondholders had the right to stand still as those outstanding have done. It is the same to them whether the state holds them or the original owners.

Accepting this view, it is insisted in the next place that at least no interest should run on the bonds held by the state until after the company ceased to pay interest on the guaranteed bonds substituted for them; otherwise, it is said, the company pays interest twice on the same debt—on the bonds held by the state, and also on the guaranteed bonds given in exchange for them. This would be true if the bonds tranferred to the state had been directly for the benefit of the holders of the guaranteed bonds as cumulative security. In that case the payment of one security would discharge the other pro tanto. But these are not double securities to the same creditor. The parties were competent and they have made this arrangement. The guaranty and the statutory lien stand as the security of the bondholder, and these

mortgage bonds are the security of the state for its liability as guarantor.

Interest is only the legal accretions of the principal and becomes part of the debt. The security of the transferred bonds and interest not being to the same creditor, is unaffected by payments on the guaranteed bonds, but is affected by its character as an indemnity, and as soon as the guaranteed debt is paid, and the state saved harmless, its functions, as a guaranty, will have been accomplished, and the excess, if any, fall into the assets of the company. It may be remarked, in passing, that this claim of the state, under the first mortgage, is primarily an indemnity to the state as guarantor, rather than a direct security to the bondholders for their debt, and in this regard differs from the security of the statutory lien, which, as we have seen, is a security primarily for the creditor. Being an indemnity, it may be that this security of the state, according to the principle so strongly urged upon the court, might be relinquished or waived by the state, but the claim is as a bondholder under the first mortgage, which is expressly excepted from the operation of the fifth section of the act of 1871, in regard to waiver.

It only remains to consider the relative priorities as between the bonds issued under the acts of 1861, 1866 and 1869. The court is not informed whether there are any bonds still outstanding, issued under the act of 1861, and still having the caption of "The Confederate States of America." If there are any such, they are unaffected by the provisions of the acts subsequently passed, the terms of which they have not, directly or indirectly, accepted, and must rank next after the first mortgage bonds as the first class of guaranteed bonds.

The act of 1866 did not assume to create a new statutory lien, but to re-affirm and extend that of 1861. It did, however, enlarge the amount of bonds authorized to be issued from $900,000 to $1,500,000—a difference of $600,000; but of this apparent enlargement $350,000 are for interest which had accrued, and which, in fact, was part of the old debt, so that to the amount of $1,250,000 the act of 1866 was substantially a substitute for the act of 1861. If the interest had not been represented by certificates of indebtedness, the debt and interest, which were already

under the mortgage and statutory lien, would have amounted to this statutory sum. But the fourth section of the act of 1866 did provide for another issue of bonds and certificates of indebtedness, to the amount of $250,000, to fund the floating debt of $600,000, by a compromise of one for three. To this extent a new debt was incorporated and the old lien of 1861 *extended over* it. It is argued that this was a wrong done to holders of bonds issued under the act of 1861 and *re-issued* under the act of 1866 —the $700,000 confederate bonds; that the legislature cannot extend the lien which belonged exclusively to them over an increased debt, and thus impair the value of their security; that to extend an old lien over a new debt, is, in effect, to create a new lien for the new debt, which must leave the old debt under its own lien and take its place in the order of priorities by the date of the extending act. There is great force in this view, so far as the element of new debt is concerned, and we have already held that the bonds issued during the war under the act of 1861 and never passed under the act of 1866, must have priority and take rank from the date of the former act. But as to those bondholders who came in and accepted bonds issued under the act of 1866, we think this objection does not apply. They have accepted the advantages offered by the act of 1866, and they must take its disadvantages. This principle of estoppel is fully developed in the case of Hand *v.* Railroad, before referred to. We can add nothing to what is there said also upon this point, and will not re-open the argument. The court says: "It is too clear for argument or the citation of authorities, that one taking a provision made for himself by statute, must take upon the condition upon which it is offered. This principle equally applies to express conditions and such as may be fairly implied from the terms of the statute." (*P.* 348.)

To this it is replied that this is a different case from that of Hand. That the act of 1866 offered no valuable consideration and imposed no conditions; that it only *re-issued* the bonds in a different style. That the act is not a unity, but divisible, and, in fact, four different acts in one. That the *first* section provides simply for the re-issue of the bonds issued under the act of 1861; that the *second* section only provides for the deficit under the

same act; that the *third* section provides for an issue of certificates to pay interest, and that the *fourth* section provides for a new issue to fund the floating debt. It is true that these pro-visions are in different sections, but they are part of one act upon the same general subject. None of the above sections re-enacts the lien; that is in still another section, the *sixth,* which declares " that the statutory mortgage contained in the second section of the act of which this is amendatory, shall constitute a lien to secure *the payment of principal and interest of the entire debt of* $1,500,000, *thus guaranteed in the adjustment of the original mort-gage and guaranteed debt of said company, and also the debt of* $600,000 *and interest thereon, which is not secured by mortgage."* The results of the war had made necessary a re-adjustment of the debt of the company. The act of 1866 embodies a carefully prepared plan upon the whole subject, and not upon any separate part. So far as its general purpose is concerned, it is an entirety, and we cannot avoid the conclusion that those who accepted some of its provisions are bound by all.

The act of 1869 provides as follows: " That to enable the said company to fund the interest due upon their mortgage and guaranteed debt for the six months, viz., from January 1st to July 1st, 1868, the comptroller-general is authorized and directed to endorse the name and credit of the state upon the bonds and certificates of indebtedness of the said company to the amount of *fifty thousand dollars,* to be applied in all respects and in the same manner and with the same conditions and restrictions as is provided in the act of December 20th, 1866, for the funding of interest, and the statutory lien is hereby extended to cover the additional sum of fifty thousand dollars herein provided."

The company and the bondholders accepted this act. The bonds and certificates of indebtedness were issued, we must suppose, in accordance with its terms, and the last question is made by W. A. Clark, trustee under the second mortgage. He insists " that, as the act of 1869 was passed after the second mortgage was executed, the $50,000 bonds issued under its provisions are subject to the lien of the second mortgage bonds."

The Circuit judge states that " there was no proof before him as to the date of any of the second mortgage bonds, but it is

quite certain that it was after the act of 1871, which purported to postpone the statutory lien."

It was stated at the bar that this was a mistake in fact, and we have no evidence upon the subject before us. It does not, however, seem to us to be a material inquiry whether any of these bonds were issued between May, 1867, and February, 1869. It must be remembered that these bonds were issued only to fund interest in arrears.

Should the bonds and certificates issued under the act of 1869 be postponed to the second mortgage bonds only because of the date (1869) of the act which authorized their issue? The act of 1869 created no new debt, but put in a new form on credit the interest on the old debt from January to July, 1868. The coupons funded were already secured by the lien of 1866. They were as high security as the bonds from which they had been cut, and entitled to share "*pari passu*" with them. *City of Kenosha* v. *Lamson*, 9 *Wall.* 483; *City of Lexington* v. *Butler*, 14 *Wall.* 282; *State* v. *The Spartanburg and Union R. R. Co.*, 8 *S. C.* 129. If the coupons had not been funded they would now have the effect of enlarging the lien debt by the amount of this issue. Must the holders of these bonds be postponed only because they accepted these bonds and certificates in exchange for their coupons already secured by lien? That must depend upon the terms upon which they were issued and received. Whether one security operates in payment or satisfaction of another, is always a question of intention. Did they intend to discharge the coupons already due and relinquish their lien by taking in satisfaction bonds for the same amount not due for twenty years, and to be secured by a postponed lien? The bond or certificate is not the debt, but the evidence of it. Nothing is payment but that which produces payment, or is received as payment. To give one security for another of equal dignity, without the intention of discharging the debt, is not payment, *but substitution*, and in such case it is well settled that a lien, such as a mortgage previously existing, is not discharged, but remains and still secures the debt in the new form. *Burton* v. *Pressly, Cheves' Eq.* 1; *Costello* v. *Cave & Bradley*, 2 *Hill* 528; *Gardner* v. *Hust*, 2 *Rich.* 608; *Kelsey* v. *Rosborouyh*, 2 *Rich.* 244; *Bank* v. *Bobo,*

9 *Rich.* 34; *Adger* v. *Pringle,* 11 *S. C.* 527; 6 *Wait's Act. & Def.* 410, 413, 417.

Here the intention is not doubtful. The bonds were issued and accepted, according to the terms of the act, which is the contract of the parties, and this declared expressly that the statutory lien of 1866 "*is extended over them.*" From the view which the court takes, the bonds issued under the act of 1869 should have priority to the bonds issued under the second mortgage of 1867, without regard to the date of their issue.

The result of this reasoning would be to place the bonds issued under the act of 1869 on the same footing with those issued under the act of 1866; but that part of the Circuit decree which places the bonds of 1869 "after" the bonds issued under the act of 1866, not being appealed from, we are not at liberty to disturb it.

It is adjudged that the Circuit decree be affirmed and the appeal dismissed.

WILLARD, C. J., and McIVER, A. J., concurred.