JEREMIAH S. ANDREAS *vs.* JOHN W. HUBBARD AND OTHERS.

Where *A* has a mortgage on two pieces of land and *B* acquires a later title to one of them, *B* can not redeem his piece by paying *A* a proportionate share of the mortgage debt, but must pay the whole, and standing on that mortgage foreclose the mortgagor's interest in the other piece; the mortgage debt in that case being apportioned between himself as owner of the equity in one piece and the mortgagor as owning that in the other.

And the same rule applies even though *A*, the mortgagee of the two pieces, has himself acquired the equity of redemption in the other piece.

Where however *A*, as mortgagee of the two pieces, ask for or consents to an apportionment, a court of equity will make it.

And where *A*, having acquired the equity of redemption in the other piece, asks for a foreclosure only of the piece of which *B* holds the equity, he will be considered as assenting to an apportionment of the mortgage debt.

The rule of apportionment in such cases is to apply the security to the debt according to its proportionate value. That is, as the value of the whole security is to the value of the particular part, so is the amount of the whole mortgage debt to the amount which is to be paid on redeeming that part.

Where *A* holds a mortgage on two pieces of land and *B* a later mortgage on the second piece and also on a third piece, and the first and second pieces are more than enough to satisfy the first mortgage debt, but the second and third pieces, with the second encumbered, are insufficient to satisfy the second mortgage, it is a rule of equity that the first piece shall be first applied upon *its* mortgage debt, so as to leave as much as possible of the second piece for the benefit of *B's* mortgage.

This rule is one of easy application where, as in many of the states, the mortgaged property is sold by order of the court and the proceeds applied; but in this state, where the property itself is taken for the debt, the same principle is recognized.

Where *B* holds a second mortgage of one piece of land, previously mortgaged with others to *A*, and also of other lands not covered by *A's* mortgage, but complicated with still other lands by reason of other later mortgages of those lands to other parties, which later mortgages give the holders of them by reason of their inadequacy a standing in equity for asking to be allowed to redeem *A's* mortgage, *A* is not bound, in seeking a foreclosure of his mortgage, to make these other mortgagees defendants.

The right of these parties to redeem *A's* mortgage would not appear of record and would depend entirely on the fact of their security being insufficient—a fact wholly extraneous, and of which *A* could not be supposed to have any knowledge.

Their duty, if they wished to get the benefit of the property mortgaged to

*A,* would be to bring a suit for redemption, or at least to give notice to *A* that they claimed a right to redeem.

Their right to go into a court of equity and obtain a decree for redemption, would not be of itself an existing and recognized equity, but would be a mere equitable relation to the property, and their equity would be established by and depend upon the decree of the court.

And the equity thus decreed would take effect subject to all rights existing at the time the suit was brought.

Where a mortgagee has foreclosed a mortgage and his title has become absolute, the fact that the value of the mortgaged property is greater than the mortgage debt, constitutes no ground of equitable claim on the part of persons interested who were made parties to the suit.

And a party who, if he had gone seasonably into a court of equity could have had a right of redemption decreed in his favor, but who failed to do so, and neglected to give notice to the mortgagee of his claim of a right to redeem, and who had therefore at the time of the foreclosure no such known relation to the property as made it the duty of the mortgagee to make him a party, is not entitled to equitable aid on the ground of such excess of value.

SUIT for a foreclosure; brought to the Superior Court in Fairfield County. The mortgage covered three pieces of land, as to only one of which a foreclosure was now sought. The plaintiff held the mortgage by assignment from an assignee of the original mortgagee. The following facts were found by a committee:

The three tracts of land described in the petition were mortgaged by Albert Seeley to Heth Stevens, to secure the payment of the note of Seeley to Stevens for $1,000, on the 18th day of May, 1857. The mortgage contained the usual covenants of warránty and seizin. Heth Stevens died January 8th, 1870, leaving a will, in which Hiram Curtis was appointed executor. Curtis accepted the appointment, and, as such executor, on the eighth of August, 1870, sold the mortgage, with a conveyance of the mortgaged lands, to Diantha Curtis. Diantha Curtis sold the mortgage and quitclaimed the lands to Rufus Lockwood, on the 30th of January, 1874. Rufus Lockwood in like manner sold the mortgage and quitclaimed the lands to the petitioner, on the 24th of January, 1878; and the petitioner is now the owner of the note and mortgage. It has never been paid, unless the facts hereinafter found constitute a payment of

it or of some part of it.    Interest has been paid on the note
up to the 4th of May, 1874, but none has been paid since
that date.

On the 1st of August, 1866, Seeley mortgaged to Alex-
ander Hubbard the tract of land last described in the mort-
gage to Stevens, to secure his note to Hubbard for $8,000.
This tract was known as the "Salt Meadow," and is the
one as to which the present foreclosure is sought.    This
mortgage covered several other pieces of land then owned
by Seeley, and which were not included in the mortgage to
Stevens above mentioned.

On the 19th of September, 1868, Seeley again mortgaged
the same premises to Hubbard, to secure two notes, one for
$2,600, and the other for $1,000.

Hubbard brought his petition to the March term, 1875, of
the Superior Court for Fairfield County, for a foreclosure
of the two mortgages last mentioned and of certain other
mortgages then held by him against Seeley.    Hubbard died
March 1st 1876, while his petition was pending in court, and
it is understood and agreed by the parties to this proceed-
ing, that all the rights which Hubbard had at the time of
his decease, in the premises covered by the mortgage sought
to be foreclosed in this proceeding, then passed to and
vested in John W. Hubbard, George N. Hubbard and William
Hubbard, the present defendants, and that they now hold
and own the same.

A decree was passed upon that petition, at the December
term, 1875, of the court, by force of which the title of John
W., George N., and William Hubbard, in all the premises
mentioned in the petition, as against Seeley and all persons
claiming under him, (the mortgage title in the Stevens mort-
gage excepted,) became absolute on the 3d day of October,
1876.    On that day they became, and ever since have been,
the owners of the equity of redemption in the premises now
sought to be foreclosed, and have been and now are in pos-
session of them.    On the 14th of October, 1876, they
caused a certificate of foreclosure to be recorded in the

land records of the town of Stamford, in which the premises were situated.

The premises of which they obtained title by this foreclosure, exclusive of the salt meadow now sought to be foreclosed, were worth, at the time they obtained title, $97,000, and the claims for which they held this property as security was $90,000.

Seeley also made another mortgage to the petitioner, on the 12th day of August, 1874, to secure his note to him for $20,000. This deed covered the two tracts first mentioned in the Stevens mortgage. Afterwards, and about the 1st of January, 1878, and before the petitioner purchased the Stevens mortgage, he made an arrangement for the purchase and conveyance to him from Seeley of his interest in the premises covered by his mortgage for $20,000 and in those covered by the Stevens mortgage; and also arranged with Rufus Lockwood for the purchase of the Stevens mortgage, which Lockwood then held. The business was done by J. B. Curtis, Esq., who acted for all the parties. In pursuance of this arrangement. Mr. Curtis prepared the deeds for execution, and Seeley executed his on the 21st, and Lockwood his on the 24th of January, 1878. Both deeds were left with Mr. Curtis, to be delivered to the plaintiff, and they were delivered to him, and left for record at the same time, namely, on the 28th of January, 1878. By the deed of Seeley, the plaintiff acquired title to the two tracts of land first described in the Stevens mortgage, and the defendants have, and claim, no interest in either of the first two tracts. The defendants, by their foreclosure against Seeley, acquired all the title which Seeley then had in the salt meadow, the piece last described in the mortgage, and the determination of this cause can affect the rights of the parties in this tract only.

The petitioner paid nothing to Seeley for his quit-claim of January 21st, 1878. The premises conveyed by that deed were encumbered to the amount of $23,000, and were worth $15,000 only.

The value of the third tract, (the premises sought to be foreclosed,) is $500.

If these facts do not constitute a payment of the mortgage note described in the petition or of some part of it, there is now due upon the note the sum of $1,454.33.

Upon these facts the court (*Hovey, J.,*) rendered the following judgment:—

"Upon the facts found, if the plaintiff were seeking to redeem the premises which he is seeking to foreclose, he would be allowed to do so upon his paying to the defendants such a portion of their mortgage debt of $11,600, as the value of the premises sought to be redeemed bears to the value of the entire premises mortgaged to secure the payment of that debt, less such a proportion of the amount due to the plaintiff upon the Stevens mortgage, as the value of the premises sought to be foreclosed in this suit bears to the value of the entire premises covered by that mortgage. The first mentioned proportion being $303.60, the proportion last mentioned $46.91, the difference between the two, being $256.75, is the sum the plaintiff would be required to pay to redeem the salt meadow, the premises sought to be foreclosed in this suit. The difference between that sum and the value of the salt meadow, as found by the committee, being $243.25, is therefore the sum which the defendants ought to pay to the plaintiff to redeem the salt meadow."

The court, therefore, decreed a foreclosure of the defendants unless they should pay the plaintiff the sum of $243.25 within a time limited by the decree.

The defendants brought the record before this court by a motion in error.

*A. S. Treat* and *C. Sherwood*, for the plaintiffs in error.

1. After his deeds of warranty to Hubbard, manifestly Seeley himself had no further claim on the salt meadow on account of the Stevens mortgage, and of course he could not convey to the plaintiff what he did not himself have, so that by these deeds, so far as he and the plaintiff are concerned, the salt meadow was freed from the burden of the Stevens mortgage. When there are conveyances of por-

tions of a mortgaged estate the rule is quite uniform to charge first with the mortgage debt the portion last conveyed. This is well settled law in this state. *Sanford* v. *Hill*, 46 Conn., 42, and cases cited. The two other tracts are found to be worth $15,000. The plaintiff, therefore, must pay his own mortgage debt, of $1,454.33. Should it be suggested that the rule we have stated does not apply to mortgages, then the court will observe that the mortgage title to the salt meadow had become absolute in the defendants before the plaintiff took his quitclaim from Seeley of the other two tracts and before he became the owner of the Stevens mortgage. So that it can make no difference in this case whether the mortgage is considered a conveyance under the rule when made, or when the equity of the mortgagor is extinguished and the title becomes absolute. But the court below says the plaintiff would be allowed to redeem the salt meadow if he were seeking to do that. If so, then it must be because he has the right to redeem, and if he has that right, then he must have acquired it from Seeley by his mortgage of August 12th, 1874, or by his quit-claim of January 21st, 1878. But after his deeds to Hubbard, Seeley had no right in the salt meadow; most certainly he had none after the foreclosure. The deeds and certificate of foreclosure were recorded. So, therefore, Seeley could neither charge by mortgage nor grant by quit-claim any right in the salt meadow. For "it is a common learning in the law that a man cannot grant or charge that which he has not."

2. The court below, in fixing the sum for which the plaintiff might redeem at $256.75, has erred in its figures and calculations. The value of the lands mortgaged to Alexander Hubbard to secure the $11,600 is made a principal factor in the calculation. But their value is not found by the committee nor any facts from which their value can be ascertained. No evidence was offered and no attempt made to find their value. The court assumed their value to be $19,100, and based its calculations upon that as their value. To make the $19,100, $7,500 was added to the

$11,600. We suppose this $7,500 was the difference which the committee found between the value of all the lands, including the salt meadow, embraced in all the mortgages foreclosed by the defendants, $97,500, and the amount of all the mortgage debts, $90,000. The court assumed that this $7,500 is the difference between the value of the lands mortgaged to Hubbard by the two deeds and the mortgage debts, $11,600, and must also necessarily have assumed that the value of the other lands embraced in all the other mortgages was precisely equal to the mortgage debts secured, $78,400. There are no facts in the case to warrant either assumption, and the probabilities are altogether that neither of them is true. It does not appear that the salt meadow was included in any but the two mortgages to Hubbard, nor whether the " certain other mortgages " which were included in his foreclosure were given to him or not originally. But even if $19,100 was the true value of the salt meadow and the other lands embraced in the two mortgages, still the rule adopted and the result arrived at is erroneous. The court seems to have undertaken arbitrarily to adjust some supposed equities between these parties as second mortgagees. The principle stated in *Osborn v. Carr*, 12 Conn., 202, 203, upon which the court relied, has no application to this case. There was a mortgage of two estates, and a second mortgage of one of them, the mortgagor retaining his equity in the other. There the question of equity was between the second mortgagee and the mortgagor. Here the question is between two second mortgagees. Three tracts are mortgaged. In September, 1868, Hubbard holds Seeley's note for $11,600, and mortgages upon one tract and upon several other tracts for security. Hubbard becomes the holder and owner of other mortgages against Seeley upon other lands amounting to $78,400. In October, 1876, the defendants, by legal proceedings, extinguished the rights of Seeley and appropriated all the lands covered by all the mortgages. The committee finds that the value of all the lands thus appropriated exceeded the mortgage debts $7,500. In August, 1874, the plaintiff has

Seeley's note for $20,000 and a mortgage upon the other two tracts for security. In January, 1878, the plaintiff under a conveyance from Seeley of his equity, appropriated the two tracts covered by his mortgage. The committee finds that the value of the two tracts was $8,000 less than the mortgage debt. So the plaintiff through his one mortgage lost $8,000, and the defendants through their several mortgages gained $7,500, and the court orders them to contribute from their gain towards making up his loss. In *Osborn* v. *Carr* the court in finding the amount to be charged against the parties respectively confined its computations strictly to the lands upon which there was a common burden. No regard was paid to the value of the lands mortgaged to Carr and Osborn respectively — whether greater or less than the mortgage debts. It would seem hardly possible they could have been exactly alike in both cases. This is substantially the equitable rule applied in that case, and applicable to this, as found under many different forms of expression. For the removal of a common burden each of several tracts must contribute in proportion to its value. Here is an incumbrance on three tracts. It should be raised by each party in proportion to the benefit which he will receive by its removal. The salt meadow, the defendants' tract, is worth $500; the plaintiff's two tracts are worth $15,000; both $15,500, in proportion of 1 to 31. The incumbrance $1,454.33 divided by 31 gives $46.91, which is all the defendants should pay, if anything.

*J. B. Curtis*, for the defendant in error.

1. The court below estimated our mortgage right in the salt meadow tract on the basis of a redemption. Suppose the Hubbards held the first mortgage and that is valued at $11,600, while the whole value of the mortgage interest, including the salt meadow tract, is $19,100, then their interest in the salt meadow tract would be $\frac{11600}{19100}$ of $500, or $303.66, subject to the deduction of the mortgage right of Andreas in the salt meadow tract, (supposing Andreas

to hold the second mortgage on it), which the court finds to be as follows: His mortgage is $1,454.33, and the whole value of the land mortgaged, including the salt meadow tract, is $15,500; then Andreas's interest in the salt meadow tract would be $\frac{145433}{1550000}$ of $500, or $46.91. This being deducted from $303.66, as above mentioned, leaves $256.75, which Andreas would be obliged to pay the Hubbards if the Hubbards held the first mortgage and compelled Andreas to redeem. When Andreas had redeemed the value of the mortgage interest which he would hold as security for the Stevens mortgage of $1,454.33, the difference between what he would be obliged to pay to the Hubbards, $246.75, and the value of the salt meadow tract, $500, would be $243.25; which the court establishes as the value of Andreas's mortgage interest in the premises sought to be foreclosed. The difference between $303.66 and $46.91 being $256.75, this sum would belong to the mortgagor, in case both the mortgages of Andreas and the Hubbards were paid out of a sale of all the lands, and the balance of $256.75 would go into the hands of Seeley as mortgagor. But under a strict foreclosure there can be no sale but only a forfeiture, and the question arises, to whom does this mortgage interest of $256.75 belong? If the Hubbards held the first mortgage it would be forfeited to them, and if Andreas held the first mortgage it would be forfeited to him, and he would be entitled to have it paid. But the court says that the sum of $256.75 shall be still further reduced by taking said sum of $256.75 from the value of the salt meadow tract or treating the mortgage interest of both parties as though Hubbard held the first mortgage and as if Andreas had to redeem the Hubbards' interest of $256.75; leaving Andreas's mortgage interest in the land what it would be if he had to pay the Hubbards' mortgage interest of $256.75, viz: the difference between the Hubbards' interest of $256.75 and $500, or ·$243.25, as the sum secured by the salt meadow tract of the $1,454.33 mortgage. Or in other words, Andreas's mortgage security on the salt meadow tract is $243.25, and on the other land $1,211.08; making the amount of his mortgage $1,454.33.

2. If the court has made any mistake in this finding it is clearly in favor of the defendants, and they cannot complain. Nor can it be said that the sum to be paid by the defendants should be only $46.91. For if the burden to be borne by the salt meadow tract is $46.91 on account of Andreas's mortgage, and $303.33 on account of the Hubbards' mortgages, then there is a balance of $256.75 which must belong to some one. And under the defendants' claim it would be the child of nobody. The decree in the court below is fully sustained by the case of *Osborn* v. *Carr*, 12 Conn., 195; see also 1 Story Eq. Jur., §§ 477, 478. It will be seen by examining the finding that the Hubbards have the whole value of their mortgage secured on another tract and a balance of $7,000 in addition, which balance they have appropriated by foreclosure. Why, then, should they be allowed to absorb the whole salt meadow tract while we hold the first mortgage thereon? Does our first mortgage give us no prior right whatever? Have we no interest in the salt meadow tract? If we have, then what interest? If the Hubbards have been paid fully in the appropriation of the first tract, what right have they to redeem the second unless they pay the full value of it, $500?

3. It is claimed that the Hubbards as mortgagees stand in the same relation to Andreas that they would have done if they had purchased the property of Seeley under a covenant of warranty. Seeley first mortgaged the salt meadow tract to Stevens, together with the tract mortgaged to Andreas. Andreas bought or obtained title to the latter tract first by his mortgage from Seeley and afterwards by quit-claim from him. He also purchased at the same time the Stevens mortgage from Lockwood as an independent transaction. The three acts were independent of each other. Andreas did not redeem this property of Lockwood. Let us further examine this claim: By mortgaging to Hubbard Seeley gave notice that he had simply mortgaged this property, not sold it. Now, if he held the equity of redemption it would be simply a presumption in

law that he would redeem the mortgage and pay the mortgage debt. For the law nowhere presumes that a man will fail to fulfill his obligations, and this is, all the notice the law would give under the claim of the defendants. Now, if we stand in the place of Seeley and have his right of redemption and are affected by him as to the Hubbards' mortgages, we had a right to have legal notice of the foreclosure by the Hubbards. If Seeley by his mortgage to Hubbard placed us in his position, which would be as to him as the second mortgagee, or the same as mortgagor to Hubbard, then when our mortgage was executed on the 12th day of August, 1874, we had the right to redeem of Hubbard through the Stevens mortgage, and Hubbard could not cut us off simply by foreclosing Seeley, for we had acquired rights by our mortgage which neither Seeley nor his mortgagees could affect, unless his mortgagee made us a party to his bill for a foreclosure, which he did not. *Lyon* v. *Sanford*, 5 Conn., 544.

4. But are we to stand only in the place of Seeley? Do we not stand in the place of Stevens, the first mortgagee, as well? The committee finds that Rufus Lockwood sold and conveyed the Stevens mortgage to Andreas. Could we not acquire Stevens's right to this property by purchase, and, if we did so, because we acquired Seeley's nominal equitable interest at the same time, would that bar us of all the rights which Stevens had or which Lockwood had as his grantee? Suppose we had foreclosed Seeley without taking a quit-claim deed from him, would this have forced us to occupy Seeley's place? If not, simply taking a quit-claim in order to prevent the expense and trouble of a foreclosure would not compel us to stand in the place of Seeley. We do not redeem the Stevens mortgage, but we buy it and pay for it, and so far are entitled to have our rights under it to the same extent as Stevens and Lockwood. We have not been forced to redeem it and therefore are not claiming our right under our equity of redemption, but we are claiming our right under a purchase of the mortgage, which could be no more affected by our previous

mortgage on the other property or by the quit-claim from Seeley than if we had never held such mortgage or obtained such quit-claim.

5. This case is clearly distinguished from a case where a purchaser by quit-claim takes solely the rights of the mortgagor and is foreclosed and compelled to pay the whole mortgage. Under a foreclosure in the latter case he takes such right of redemption as the law confers upon him. In the former case he takes such rights as are conferred by the terms of his contract. For if the mortgagee Lockwood did agree to and did confer on Andreas all his mortgage title in the salt meadow, it is very difficult to see how the court can take away from Andreas his right to foreclose the same without invalidating the contract as between him and Lockwood. The conveyance of the mortgage interest of Lockwood in the salt meadow tract was a part of the consideration of the purchase and assignment of the mortgage by Lockwood. And can the court say we shall not have that property for which we have paid a full price? Besides it would be grossly inequitable that the Hubbards should obtain from Seeley property worth $97,000, being $7,000 more than the whole amount of their mortgages, while we should obtain in value property worth only $15,000 in satisfaction of our mortgages of $21,454.33, or $6,454.33 less than our indebtedness from Seeley.

6. It is very clear that Lockwood could have proceeded against the Hubbards for a foreclosure and compelled them to pay the Stevens mortgage. In that event they would have obtained absolute title to the salt meadow tract, as well as security for their mortgage on the other property mortgaged to Andreas. Suppose that after their foreclosure of the salt meadow tract against Seeley and redemption of the Stevens mortgage of Lockwood, they should have brought their petition to foreclose Andreas; would he be compelled to pay the whole amount of the Stevens mortgage to the Hubbards and they retain the salt meadow besides? This is the necessary result of the defendants' claim; and a claim more inequitable can hardly

be conceived of. The court below in arriving at its conclusions chose to consider us as in the condition of being obliged to redeem the Stevens mortgage of the Hubbards, after they had been foreclosed by Lockwood and paid his mortgage, and after they had foreclosed Seeley, and by these two acts had acquired an absolute title to the salt meadow tract; and treated a portion of that mortgage as having been paid by the appropriation of the salt meadow tract. We submit that a ruling so favorable to the defendants should not be complained of by them.

PARK, C. J. This case presents a nice question of equity law, and one somewhat difficult of solution.

Albert Seeley in 1857 mortgaged to Heth Stevens three pieces of land to secure a note of one thousand dollars. One of these pieces, the only one as to which the question in the case arises, was called the salt meadow; the other two pieces we will call $A$ and $B$. The plaintiff has become vested with all the interest of Stevens in this mortgage and its security.

In 1866 Seeley mortgaged to Alexander Hubbard the lot known as the salt meadow, and several other parcels of land not included in the Stevens mortgage, to secure a note of eight thousand dollars; and in 1868 made a second mortgage of the same real estate to secure two other notes of twenty-six hundred and one thousand dollars. These two mortgages may for convenience be spoken of as one mortgage for eleven thousand six hundred dollars.

The only conflict between the Stevens mortgage and that of Hubbard is in their both covering the salt meadow. Until further facts came in to affect the case Hubbard could not have redeemed the salt meadow without paying the whole of the Stevens mortgage, as the holder of that mortgage was not bound to submit to an apportionment. Upon such redemption Hubbard would have become owner of the whole Stevens mortgage, and could then have foreclosed Seeley the mortgagor, or any other person holding the equity of redemption in $A$ and $B$, if they had not paid

such portion of the mortgage debt as the court should find to be proper upon a just apportionment. *Gibson* v. *Crehore*, 5 Pick., 152; *Allen* v. *Clark*, 17 Pick., 47; *Chase* v. *Woodbury*, 6 Cush., 146; *Smith* v. *Kelley*, 27 Maine, 237; *Tillinghast* v. *Frye*, 1 R. Isl., 53; *Lyon* v. *Robbins*, 45 Conn., 513; 2 Jones on Mortgages, § 1072.

But there are further facts in the case, the effect of which is to be considered. Seeley in 1874 made a mortgage to the petitioner, Andreas, (who had not then become the owner of the Stevens mortgage,) of the two lots *A* and *B*, to secure a note of $20,000. This presented the case of a prior mortgage covering three pieces of land, and of a later mortgage covering only two of them, and if Stevens and Andreas had been the only parties interested as mortgagees, Andreas would have had the right to require that the whole of the salt meadow, (not included in his mortgage,) should be applied first to the prior mortgage, so as to leave as much as possible of *A* and *B* for his own security, the whole security being inadequate to the payment of both debts in full. The rule as one of equity is well settled, and is easy of application where mortgaged property is sold on foreclosure, as is done in most of our sister states, but the same result would be reached more circuitously under our own law. *Delaware & Hudson Canal Co.'s Appeal*, 38 Penn. St., 516; 1 Hilliard on Mortgages, ch. 13, § 69.

This we say would be the equitable right of Andreas if he and the holder of the Stevens mortgage were the only parties interested as mortgagees. But here comes in the further fact that Hubbard had already (in 1866, eight years before,) taken his mortgage upon the salt meadow and several other parcels of land not included in the Stevens mortgage. We find therefore that when Andreas would crowd the Stevens mortgage over upon the salt meadow, so as to leave for his own mortgage as much as possible of the lots *A* and *B*, that mortgage encounters another mortgage resting on the salt meadow, that is, the Hubbard mortgage; and that too a mortgage which is prior in date and of course in right to his own, Andreas's, mortgage. Andreas has now

become the owner of the Stevens mortgage, but we do not see that that fact affects the application of the principle involved. So long as he was not the owner of that mortgage it was a question of how far he could crowd that mortgage over upon the salt meadow. Since he has become the owner of it the question is how far he can carry that mortgage over upon the salt meadow, and thus protect his later mortgage on *A* and *B*. It is merely the same question in another form. This is a question of much interest and of some difficulty. We will postpone its consideration for the purpose of considering another that grows out of this relation of the mortgages.

The petitioner contends that as a holder of the second mortgage on *A* and *B* he had acquired such an equitable interest in the salt meadow as gave him a right in some way to reach it, and if in no other way by redeeming the Hubbard mortgage *pro tanto ;* and that, as he was not made a party respondent to the Hubbard foreclosure this right of redemption has not been cut off; and he cites *Lyon* v. *Sanford*, 5 Conn., 544, to the point that every party having an equitable interest in mortgaged property has a right of redemption, and must be made a party to a bill for the foreclosure of the mortgage.

But, in the first place, it is very doubtful whether an interest so remote and uncertain as this can be regarded as an equity. It is rather like those cases, of which there are many, where a court of equity will, on a state of facts that makes it equitable, establish in a party's favor an equity which had no existence before. An illustration of this is to be found in *Jones* v. *Quinnipiac Bank*, 29 Conn., 25, where it is held that security given to an endorser for his personal protection does not draw to itself any equitable interest on the part of the creditor ; so that, if the endorser parts with the security he has done no wrong to the creditor, but only what he had a right to do ; but that if the endorser becomes insolvent and the creditor has no other means of collecting the debt, he may go into equity and obtain a decree establishing in his favor an equitable right

to the security given the endorser. But this equitable right when thus established takes date from that time, and is of course subject to all then existing rights in other parties, so that if the security has been released, or sold, or encumbered in the meantime, the creditor's equity is postponed to the rights so created. In the present case the right of redemption in Andreas, if a court of equity should think it a proper case for the establishment of such an equity in his favor, would be founded wholly on a circumstance not disclosed by the public records, and not to be presumed, namely, that the lots $A$ and $B$ were insufficient to secure his debt, and that it was necessary for him on that account to resort to salt meadow. It would therefore be a case where the court, in the peculiar circumstances, holds it equitable that he should have this right of redemption, and not a case where he had from the first a fixed equity. This being so, he would take that equity subject to all rights existing at the time he brought his petition. But before he brought his petition the Hubbard mortgage had been foreclosed and the title had become absolute in the present defendants.

Upon the question whether Hubbard in taking his foreclosure was bound to make Andreas a party respondent, because of his remote and possible right to redeem, it is to be considered that there may always be parties who by some extraneous facts, not shown by the public records, may be entitled to equitable aid in establishing a right to redeem. If we go outside of those whose right is manifest upon the public records, there is no knowing where one may stop. The mortgage of Andreas in this case did not touch this property, but only had a right in certain circumstances to crowd over a prior mortgage upon it. There might also be some other mortgage resting on some other piece of land covered by the Andreas mortgage and which had certain equitable rights with regard to that mortgage; and still another, more remote, which pressed in the same way on the mortgage last mentioned; all having a remote, but yet an equitable interest in the application of the salt meadow lot. If Hubbard in looking up the parties whom he was to

foreclose would be bound to ascertain the rights of all these remote and still remoter parties, it would seem impossible to secure a final and sure foreclosure in such a case. In *Osborn* v. *Carr*, 12 Conn., 195, it is held that a party purchasing is not bound to search the records of another town for lands that may have been mortgaged with a lot in a particular town, to see whether any such conveyance has been made of the former land as would throw a special burden upon the latter. But in *Hunt* v. *Mansfield*, 31 Conn., 488, it is held that a purchaser of a piece of land mortgaged with others is bound to take notice from the public records that a conveyance of that other land has been made which throws the burden of the mortgage on the land he is purchasing. Upon that principle, if Hubbard had been buying the salt meadow he would have been bound to take notice that Andreas had a mortgage of *A* and *B* which threw the Stevens mortgage over upon the salt meadow. But does the same rule apply to a mortgagee who already has his mortgage title, and compel him to notice the same conveyance? We think it does not, and for the reason that no conveyance, made after he has taken his mortgage, can increase the incumbrance that lies on the property above his own. The right of Andreas here, regarded as a right of redemption, comes in after, and subject to, the right of Hubbard, and approaches the land in question in a manner entirely indirect and consequential, and by reason wholly of facts not disclosed by the records and which may not exist. He could at any time have gone into a court of equity and had his equity established by a decree. Or he could have given notice to the owners of the Hubbard mortgage of his claim to such an equity. In the absence of anything on the public records which gave notice of the facts on which his claim is based, and of all proceedings on his part to secure his possible rights, we can not regard the owners of the Hubbard mortgage as bound to take notice of his equity and make him a party to their bill of foreclosure.

But, even if this were not so, there is a consideration which practically disposes of this question. The plaintiff claims this right of redemption as a right to redeem the

salt meadow, by itself, paying the defendants only a pro-
portionate share of their mortgage debt. But it is a well-
settled principle, as we have already seen, that a party
having a second mortgage upon a part of lands covered by
a first mortgage, can redeem only by paying the whole mort-
gage debt. Here the whole amount of the defendants'
incumbrances on the property mortgaged to them is found
to be $90,000, and the whole property worth $97,500. Now
on what ground could the plaintiff claim to redeem the salt
meadow on paying a small fraction of this incumbrance? So
far as we can see, it is on the ground that the defendants
have foreclosed their entire mortgage interest in all the
lands. But if the plaintiff's supposed right of redemption
is not barred by reason of his not having been made a party
to the foreclosure, then the foreclosure fails as to him
wholly, and not merely as to the salt meadow; and his
right of redemption, and his duty in the exercise of that
right, remain precisely what they would have been if no
foreclosure had been brought. Now he does not offer to
pay the whole $90,000 debt; it would be idle to pass a
decree giving him the right to redeem on making such a
payment. Indeed we may assume that there would be no
need of coming into a court of equity to get such a right;
the defendants would probably be only too glad to assent
to such a redemption. A debt of $90,000 secured by prop-
erty of the value of $97,500, is not so well secured but that
it may safely be assumed that the creditor would much
rather have his money than to take his chance with the
security. The accumulating interest on such a sum would,
even if the real estate security was fairly productive, very
soon consume all the excess of value in the security.

We therefore lay out of the case all consideration of the
right of the plaintiff to approach the salt meadow through
any equity of redemption.

We come back therefore to the question, the considera-
tion of which we postponed, whether the plaintiff, as owner
of the Stevens mortgage, may, for his protection as a second
mortgagee, reach over and appropriate to himself the whole
or any part of the salt meadow.

He claims that he can, on the ground that the security held by the defendants for their entire debt of $90,000 is of the value of $97,500, leaving a surplus in their hands of $7,500—while the salt meadow is found to be worth only $500; so that they are paid in full, and more than paid, without touching the salt meadow.

This claim is not without plausibility, and perhaps not wholly free from difficulty. There would seem to be a certain degree of justice in it. We think however that when the Hubbard mortgage was foreclosed, and the mortgage title became absolute by the failure of all parties interested to redeem, the question of the value of the premises above the debt was foreclosed with the rest. That value could have been enquired into for the purpose of ascertaining whether it was sufficient to pay and consequently did pay and extinguish the debt; but if a foreclosing creditor gets more than enough to satisfy his debt it is the debtor's loss and his gain. The debtor and those who held under him have had their day in court and can not have another. There must be a quieting of the title somewhere and an end of controversy over the whole matter; and that end is reached when the last day of redemption has gone by and no party has redeemed. We think therefore that this excess of value must be wholly laid out of the case.

When therefore the plaintiff, standing on the Stevens mortgage, endeavors to crowd the Hubbard mortgage off from the salt meadow, it encounters a fixed and not a yielding barrier; a line clearly drawn over which it can not pass; a title absolute and impregnable, subject only to such portion of the Stevens mortgage as may be regarded as equitably resting upon it. If it were not so it is not easy to see why the plaintiff might not take the whole of the salt meadow, and not a mere fraction of it, as the fact of the defendants being overpaid, if a reason for their yielding anything, would be a reason for their being required to give up the whole, since the whole might be taken from them and still leave their debt paid.

The case then becomes simply a question of apportion-

ment between the defendants as owners of the salt meadow, and the plaintiff as owner of the Stevens mortgage. Every other fact may be laid out of the case.

It is very clear that if the Stevens mortgage stood by itself, with the equity of redemption in another party, the defendants could not redeem the salt meadow by paying an apportioned part of the Stevens mortgage. The principle we have before referred to would compel them to pay the whole of it. But the plaintiff is now the owner of that mortgage, of his own original second mortgage, and of the equity of redemption in the lots A and B. The equity of redemption and the mortgage interest thus became merged. It is true that those interests could have been kept distinct if the plaintiff had chosen to keep them so, and would have been so regarded in equity if it was clearly his interest and desire to keep them so. But this question is disposed of by the petitioner's own action in seeking a foreclosure of the salt meadow by itself and asking only for an apportioned part of the mortgage debt. A first mortgagee can never be required to submit to an apportionment of his debt, but can always have one where he consents to or requests it, the rule that requires an entire redemption being founded wholly on his rights in the matter. We have then a simple case of an apportionment of a mortgage debt between two parties who stand in the relation of first mortgagee of several tracts of land, and owner, subject to the mortgage, of one of the tracts, with the first mortgagee assenting to the apportionment and the rights of no other parties intervening. What is the rule of apportionment in such a case? It is clearly that of applying the security to the debt according to its value. Here the whole land covered by the Stevens mortgage is found to be of the value of $15,500; the salt meadow lot of the value of $500; the debt $1,454.33. The problem is wholly one of mathematics. As the value of the whole, ($15,500,) is to the value of the salt meadow, ($500,) so is the whole debt, ($1,454.33,) to the fraction of the debt which is to be set to the salt meadow. That amount is $46.91; and this is the amount which the defendants should be required to pay on redemp-

tion, with interest from the date of the committee's report, December 15th, 1881. The rule here applied is a universal one, and will be found to work no wrong to the prior mortgagee even where the security is unequal to the debt, since the sum set to the particular part to be redeemed will be found in that case to be greater than the value of that part of the security.

The case of *Osborn* v. *Carr*, before referred to, has been cited by both parties as having a bearing upon the present case. That case was one of great complication and involved a discussion of some of the principles which we have applied in the present case, but the facts in the two cases have too little similarity to enable us to reason from one to the other.

We have spoken of the incumbrances on the property held by the defendants as amounting to $90,000. This fact is found only in general terms in the report of the committee, and we have no means of knowing when the other mortgages constituting this incumbrance were given. The finding is in these words: "The premises of which the defendants obtained title by foreclosure, exclusive of the salt meadow, were worth, at the time they obtained title to them the sum of $97,000, and the claims for which they held this property as security amounted to $90,000." As the foreclosure was obtained in 1876, and the plaintiff had obtained his mortgage on the lots *A* and *B* only two years before, it is reasonable to suppose that this indebtedness had accrued and the security had been obtained upon it before he took that mortgage. At any rate in the absence of any direct finding on the subject we can not assume the contrary. It is perhaps, in the circumstances, a matter of no importance. If the Hubbard mortgage which the plaintiff would have to redeem is to be regarded as only $11,600 instead of $90,000, yet it is manifest that the lands, if redeemed from that mortgage, would still be subject to the rest of the $90,000 incumbrance, making a final redemption of the whole property necessary.

There is error in the judgment complained of.

In this opinion the other judges concurred.